## Smith's Adm'r v. North Jellico Coal Co.

Motion for rehearing overruled.

For former opinion see 114 S. W. 785, 131 Ky. 196.

OPINION OF THE COURT BY JUDGE HOBSON—Over-
ruling.

When this case was pending before us on appeal,
the transcript was read by five of the seven judges,
and the case most thoroughly discussed on several
occasions in consultation before the opinion was ren-
dered, after which a majority of the court reached
the conclusion that the judgment awarding a peremp-
tory instruction to the jury to find for the defendant
should be affirmed.

On the petition for a rehearing the transcript has
been re-read by two of the judges, and all of the ma-
terial parts of the evidence read in consultation to
the whole court, and we have again thoroughly dis-
cussed and considered the question involved; we
still think the original opinion contains a correct

exposition of the law governing the case, under all the facts as shown in the transcript.

The petition for rehearing is therefore overruled.

DISSENTING OPINION BY JUDGE NUNN.

The facts as stated in the opinion delivered do not agree with my construction of them. Therefore it is necessary for me to state my reasons for dissenting. A misunderstanding by the court of the facts as they appear in the record is the only way that I can account for the result.

In considering this case, it should be kept in mind that the court was not asked to reverse a judgment based upon a verdict of a properly instructed jury, but its duty, and only duty, was to carefully examine the record, and ascertain, first, whether appellant stated in his pleadings a cause of action; if so, then to determine whether he introduced any or a scintilla of testimony sustaining his alleged cause of action. If it was found that he had complied with these requirements, he was entitled to have his case submitted to the jury. All the decisions of this court on the question sustain the proposition. If appellant introduced any testimony supporting his alleged cause of action, it is then the duty of this court to reverse the action of the lower court in giving the peremptory instruction. It was a violation of the lower court's lawful duty to usurp the functions of the jury in weighing the evidence and deciding the case as it thought the evidence warranted. The Constitution of the state guarantees to persons the right of trial by jury, and, when a court takes this right from a person, it usurps its power. It is not contended that appellant failed to state a cause of action in his pleadings. Therefore the only question to be con-

sidered is: Was there any or a scintilla of evidence introduced sustaining appellant's cause of action? Upon this matter I will not content myself with the bare assertion that there was; but will quote from the testimony of each and every witness introduced, showing that there was not only a "scintilla," but much testimony sustaining his cause of action.

There were ten witnesses introduced, only seven of whom gave testimony upon the question involved. The other three were the widow, the administrator, and the physician who attended him by whom the extent of Smith's injuries and the cause of his death were shown. It is conceded that the law required appellee to furnish Smith a reasonably safe place in which to perform his work, and to use reasonable care to keep it reasonably safe for that purpose. This is a general rule of law that cannot be successfully controverted. The term "reasonably safe place" must be construed in connection with the work to be performed. There cannot be found in a coal mine, powder house, or similar places a safe place to labor. The meaning of the phrase is that the master must use due care, considering the place where the work is to be done, in making the place reasonably safe and in keeping it so. If the character of the work is unusually dangerous, there then arises the necessity of more care on the part of the master to provide and keep a reasonably safe place for the protection of the employe, and more care is also required on the part of the employe to save himself from injury.

The following quotation from the case of Pfisterer v. Peter & Co., 117 Ky. 501, 78 S. W. 450, 25 Ky. Law Rep. 1605, emphasizes this principle, to-wit:

"A master employing a servant impliedly engages with him that the place in which he is to work and

the tools or machinery with which he is to work or by which he is to be surrounded shall be reasonably safe. It is the master who is to provide the place and the tools and the machinery, and, when he employs one to enter into his service, he impliedly says to him that there is no other danger in the place, the tools, and the machinery than such as is obvious and necessary. Of course, some places of work and some kinds of machinery are more dangerous than others, but that is something which inheres in the thing itself, which is a matter of necessity, and cannot be obviated. But within such limits the master who provides the place, the tools, and the machinery owes a positive duty to his employe in respect thereto. That positive duty does not go to the extent of a guaranty of safety, but does require that reasonable precautions be taken to secure safety, and it matters not to the employe by whom that safety is secured, or the reasonable precautions therefor taken. He has a right to look to the master for the discharge of that duty; and if the master, instead of discharging it himself, sees fit to have it attended to by others, that does not change the measure of obligation to the employe, or the latter's right to insist that reasonable precaution shall be taken to secure safety in these respects.' "

I will now proceed to show from the record that appellee did not furnish Smith a reasonably safe place to work, or use any care whatever to put and keep it in a reasonably safe condition. James Woodward, the helper of Smith at the time he received his injuries, in speaking of the place where Smith was killed, testified as follows: "Q. Now, tell the jury if there was a hill seam there, and, if there was, where it ran with reference to the entry? A. Yes; there

was one.  Q. Describe that seam the best you can as
if you were describing a crack in a room? The
width or depth and how it ran with reference to the
entry and neck of the room?   A. It ran across the
entry and across into the corner of the room neck.
Q. Which side of the room neck?   A. Left-hand side.
Q. Tell the jury what kind of a top that was at this
room neck and along that entry at that place.   A.
Most of it was bad top.   Q. What do you mean by
'bad top'—rotten top? A. Yes, sir.   Q. Do you know
whose duty it was to look after that?   A. I suppose
the bank boss was supposed to look after it.   Q. To
what extent was that bad top around in that neigh-
borhood? A. Most of it around there was bad.''

George Owens, with reference to the same subject,
testified as follows: ''Q. Describe the condition at the
top of that mine where the room neck was turned off
where Smith was hurt?   A. I don't know whether
the room was cut the last time I was in there before
he was hurt.   There was loose slate hanging in places.
It is called a bad entry.''

Henry Davidson testified as follows: ''Q. Tell the
jury if you know what was the condition of that top.
A. It was a pretty bad top.   Q. What is a bad top?
A. Loose, bad top.   Q. Is there such a thing as a rot-
ten top?   A. Yes, sir.   Q. Tell the jury whether or
not this was rotten?   A. Yes, it was rotten.   Q. Did
you notice any hill seam there?   A. Yes.   Q. Explain
to the jury.   If they weakened the top, how they do
it?   A. It runs in on the rib and weakens one side
of it.   Q. State whether or not the slate is more liable
to fall where there is a hill seam than where there is
none? A. Yes, sir.   Q. What ought to be done to
make it safe in case of a hill seam?   A. It ought to
be timbered to make it safe.''

We find that there was ample proof that appellee failed to furnish Smith a reasonably safe place to work; but it is said or intimated in the opinion that it was the duty of Smith to call for props and place them so as to protect himself. This is not the fact. It was not his duty to clean up this room or entry, and make them safe by the use of props or by other means. The witness Woodward, in speaking of the duties of Smith, testified as follows: "Q. The only thing he (Smith) was connected with was simply running that machine? A. Yes. Q. The company had other men to look after props and other work? A. Yes."

Witness Owens said: "Q. In cutting that entry, Smith had nothing to do about fixing the roof? A. No, Sir; it wasn't his duty to fix the roof."

Witness Davidson testified as follows: "Q. What duties are incumbent on the man who runs the machine? A. Cut coal for the loaders. Q. In what way do they ascertain where to cut? Who directs them to the place where they shall cut? A. The man that loads the coal. Q. What are the duties of the machine man with reference to looking after the safety of the roof where he works? A. He ain't got any I don't suppose. Q. Who does that? A. The loaders. Q. State whether or not it is the duty of the machine man, when he goes to cut this coal, after he understands a place is ready—is it his duty to look after the roof or safety of a place where he cuts? A. They hardly ever do. He takes the loader's word for whatever he tells him."

Thomas Profit gave the following testimony: "Q. State what you do as a loader? A. I clean the place up ready for the machine man to cut. Q. Does the machine man get any part of your wages? A. No,

sir. Q. Do you have any connection with his wages in your work? Does he pay you anything or dó you pay him anything out of your wages? A. No, sir. Q. Does the machine man have anything to do with what you do? A. No, sir. Q. What does the machine man do? A. He cuts coal. Q. Operates the machines? A. Yes, sir. Q. Is that all he does? A. Yes, sir.'

John Profit also said: "Q. Are you acquainted with the duties of the machine man? A. Yes, sir. Q. What does he do? A. He just cuts the coal. Q. After he cuts the coal, does he have anything further to do with it? A. No, sir. Q. After he cuts the place, what does he do with his machine? A. Loads it up and goes to another place, where it is cleaned up. Q. How does he know where to go and when the place is ready? A. The loaders generally tell him. Q. How do they report to him? A. When they get a place cleaned up, they tell him it is ready. Q. When you tell him it is ready, what does he understand that to mean? (Defendant objects. Objection sustained.)"

It was the duty of the loaders to clean up the room and pull down the loose slate, and prop the entry for the protection of the machine man and his helper. The witness Aaron Jones testified that he and one Mullens were employed by appellee as loaders, and continued as follows: "Q. Where was he (Smith) when you saw him last before the slate fell on him? A. Unloading his machine to cut that. Q. Who had charge of that place where the slate fell on him? A. Me and Richard Mullens. Q. Your duties were to load coal. A. Yes, sir. Q. What other duties did you have? A. Pull down all loose slate. Q. Who did you pull the slate down for, and what for? A. For the machine man, to keep it from falling down in his

way.  Q. What do you mean when you say you are ready for him to go to work?  A. I've done my duty. Q. What does he understand?  A. That I have done my duty.  Q. Does he understand that you have tested it and made it safe?  A. Of course, he does.  Q. It is the duty of the loader to notify the machine man when he is ready?  A. Yes, sir.''

The witness Owens testified as follows: ''Q. What was the duty of the loader as to preparing the place for the machine man to work?  A. It was his place to see that the place was all right for the machine man, and pull down loose slate, and see that the props were all right.  Q. State whether or not the machine man had anything to do about looking after the roof of the mine where he worked or whether that was his duty?  A. I don't suppose it was his duty.  Q. To whom was he to look for conditions?  A. He was to go to the loader if the place was not in shape.  He looked to the loader to see that his place was all right.''

The witness Thomas Profit also testified: ''Q. How long have you followed the occupation as a loader? A. About seven or eight years.  Q. Tell all the duties of a loader?  A. To see that the room is cleaned up. Pull down the loose slate and fix it up for the machine man to cut.  Q. Why does he pull the slate down?  A. To keep the machine man from getting hurt.  Q. Who is it that looks after the safety of the place where the machine man works? (Defendant objects; objections sustained.)  Q. Did the company have anybody to inspect these places and make them safe for these men?  A. Yes.  Q. Who was that?  A. Gin hands.''

See the quotation from his testimony copied above. The witness John Profit said: ''Q. What particular

employment did you have in the mines and do you
have now? A. Loading coal. Q. How long have you
been engaged in that occupation? A. Eight or nine
years. Q. Tell the jury what is the duty of a coal
loader and what he does. A. His duty is to clean up,
I suppose, and pull down the slate. Q. What does he
load? A. Coal. Q. What else do you do, if anything?
A. That's all—load coal and set timber. Q. Do you
do anything else? A. Yes, sir; pull slate.''

I have shown that there is testimony in the record
that the place where Smith was put to work was very
unsafe. Indeed, this is conceded in the opinion by
the court. I have also shown that it was not Smith's
duty to make or keep it in a safe condition. This
duty devolved upon the loaders or ''bank boss,'' Mar-
tin. I will now proceed to show that the bank boss,
Martin, marked the place, which was, in effect, an
order to Smith to cut this room neck, where he was
killed; that Martin knew of the hill seam, which
crossed the roof of the entry at an angle of about 45
degrees and entered the place that Smith was di-
rected to cut; that he told a witness that he was go-
ing to prop it, and that he also knew of the rotten
condition of the roof, and so did the loaders, for
some time before Smith was killed. And there is
not the slightest testimony appearing in the record
that they or any of them informed Smith of these con-
ditions, nor is there any testimony showing that
Smith knew of these facts, except from the state-
ments of some of the witnesses to the effect that they
supposed he knew as the defects were patent to them.
The witness Aaron Jones, one of the loaders, after
stating that Smith had made one cut in that room the
evening before to a depth of four and a half or five
feet, continued as follows: ''Q. Had you seen the

bank boss, David Martin, after that first cut, had been taken out? A. No, sir. Q. When had you seen him? A. That morning before I finished taking it out. Q. Whereabouts? A. Right at that place. Q. What was said between you and him at that time? A. Nothing more than he said he was going to set timber. Q. Where? A. On the entry. Q. On the entry of this room that had been drawn off at this time? A. Beyond the entry where the hill seam went across. Q. How did this hill seam run with reference to this room neck? A. I think it run kinder anglin into the neck. Q. Martin was there on that morning before you had moved all the coal? A. Yes, sir. Q. Did you call his attention to the hill seam? A. No, sir; it was plain for everybody to see. Q. He said that he was going to have timber put there? A. Yes, sir. Q. Did he say for what purpose? A. Across that hill seam in the entry. Q. What did he say about it being needed? A. Just said he was going to put it there. Q. Did he say why? A. No, sir; because I knowed what he was going to put it there for. Q. What was the reason he was going to put that timber there? A. To keep slate from falling. Q. Did he know who had been cutting in that place? A. Yes, sir. Q. How do you know? A. He saw Smith waiting for another place to cut before he came down there. Q. How do you know? A. He said he did. Q. How did you know that Mr. Martin knew that Mr. Smith was working on that entry? A. Every bank boss knows exactly where his machine men are at work. Q. Did he understand that Smith would be back there to work when you got that coal moved that morning? A. Yes, sir." That the loaders knew of this defect, see the quotations from other testimony.

The statement in the opinion that "Smith had cut in some eight or ten feet and the coal had been taken out" is a mistake; and there is not the slightest testimony in the record supporting it. All the witnesses who spoke upon the subject stated that there had been only one cut made in the room with the machine, and that it would only cut 4½ or 5 feet, and the coal had been taken out of that preparatory for Smith to make another cut. When he was making the second cut, sitting on his board about nine feet in length, facing the coal in the room and managing his machine, he received his injuries, which shows that he was inevitably sitting near the edge of the entry. The testimony shows that the piece of slate that fell was six or more inches thick, six or seven feet long, and four or five feet wide; that it first gave way in the edge of the entry at the hill seam, and ran to a feather-edge in the room. The witness Davidson, after describing the board and the machine that Smith was using and the depth of the first cut, stated that it required two cuts with the machine to undermine the coal in the room which was ten or more feet wide, and continued as follows: "Q. Now, after he has made these cuts and there is a hill seam across the entry running to that neck, is there any trouble about the bank boss timbering that to make it safe? A. No, sir. Q. Is that the usual and proper way to make it safe to timber it? (Defendants object. Objections sustained.) Q. If the hill seam ran clear across would it not tend to strengthen it? A. Yes; it would have saved the entry. Q. It would have prevented the slate from starting to break in the entry and running on down in the neck? A. Yes."

The court concludes its opinion by saying in effect that it appeared from the evidence that it was the

duty of Smith to call for props when he needed them, and, having failed to do so, he could not recover. It is true the testimony shows that, when any employe in the progress of his work discovered any dangerous place, it was his duty to make it known, and have it made safe or do it himself. This is a self-evident proposition, but in this case there was no evidence whatever that Smith discovered these defects, or had any information with reference thereto. At least two of the witnesses of the seven testified that they had no knowledge of these defects prior to the falling of the slate, but it is shown that the bank boss, Martin, at least, knew of this hill seam, and regarded it as being dangerous, and said that he was going to have it propped. At the time he made this statement, he knew he had marked out this dangerous place for Smith to cut a room, and knew that Smith was then waiting for the room to be prepared for him to make another cut; but, notwithstanding this knowledge on his part, he not only suffered and permitted, but in effect ordered Smith to continue to work before it was propped, and without giving him warning of the danger. But, suppose the proof does show that Smith saw the hill seam, it is not decisive of the fact that he knew the danger and risk incident thereto and that he was assuming in working thereunder. The proof only shows that he had been working in the mine as a machine man for about twelve or eighteen months. There is not a scintilla of evidence that he had ever been engaged to remove slate or to prop rooms or entries to make them safe. In view of these facts, the following quotation from Ashland Coal & Iron Railway Co. v. Wallace, 101 Ky. 640, 42 S. W. 747 (19

Ky. Law Rep. 849), is in point, to-wit: "Defects in the roof of a mine which might be perfectly apparent to the eye of a competent inspector might have no significence to a laborer or an employe who had had no experience in this special employment; and it would be unreasonable to charge him with contributory negligence simply because he sees defects, unless a reasonably intelligent and prudent man, would under like circumstances, have known or apprehended the risks which those defects indicated. The dangers, and not the defects alone, must be so obvious that a reasonably prudent man would have avoided them in order to charge the servant with contributory negligence." Appellee's position in this case, which is in effect sustained by the opinion of the court, is that every laborer in its mine must look out for himself; that he must stop his work, investigate the conditions of his surroundings, and, if he finds dangerous places, he must make them safe. To do this would require a loss of time to each hand of 30 or more minutes a day; and would of necessity require that every man upon entering a mine be an experienced miner. However, this is not true, unless there be a special contract to that effect. It would change all rules of law with reference to the subject, and would involve the coal companies in such a loss that they could not survive any length of time. In addition to this, employes should not be required to bear this loss of time, unless there is a special contract to do so. As this action was brought under the provisions of the Constitution and statutes, it was not required of appellant to allege and prove that Smith did not know of the defects in the roof and the dangers incident thereto; but it devolved upon appellee to allege and

prove that he did know, not only of the defects, but also of the dangers likely to result therefrom.

In the case of Lexington & Carter County Mining Co. v. Stephens' Adm'r, 104 Ky. 508, 47 S. W. 323 (20 Ky. Law Rep., 696), the court, after discussing the principle applicable to an action brought for personal injuries when death did not ensue, said: "But it must also be remembered that a recovery in such cases is authorized by the common law, and that at common law no recovery can be had for injuries resulting in the immediate death of the person injured. The right to recover in case of death is authorized by the constitution and statutes enacted by the Legislature, which give an absolute right to recover where death ensues from the negligence or wrongful act of the defendant, and it will be observed that the statute makes no reference to the knowledge or contributory negligence of the decedent; and, while it may be true that the administrator or heir would not be allowed to recover in a case where the decedent had knowledge of the danger or risk he was about to incur, yet such negligence is a matter of defense, and, to be made available, must be pleaded and proved by the defendant. Any other construction of the law would, in effect, make it a dead letter, for the reason that, the injured party being dead, it would be impossible to prove that he was not aware of the danger, or that he could not with reasonable diligence have ascertained the danger." I have shown from the record that appellee's mine, in which Smith was employed to labor was defective and dangerous; that he lost his life by reason thereof; that it was the duty of appellant to make the place where Smith was injured reasonably safe, and to use ordinary care to keep it so; that it was not the duty of Smith to do

this; but this duty was assigned to the bank boss and the loaders, and they utterly failed to perform their duty in this respect.

The only question left is as to the contributory negligence of Smith. There is no proof that he was negligent, except a few of the witnesses assume that he knew of the defects in the roof, because, in their opinion, the defects were patent. There was not the slightest intimation that Smith had any experience or knowledge in examining the roof of mines for the purpose of ascertaining defects and securing them with props. He was an experienced machine man. The question of the contributory negligence of Smith barring a recovery should unquestionably have been submitted to the jury and the court erred in refusing to do this. The case of Ashland Coal & Iron Railway Co. v. Wallace, supra, was one where the facts were very similar to the case at bar. It appears that in that case the person injured was an experienced miner, and was at the time of his injuries laying track in an entry of the mine. In that case the court said: "In actions like this questions of negligence are for the jury to determine. The ordinary care which parties are required to use in the discharge of their respective duties varies so much with the situation of the parties and the circumstances of each particular case that the policy of law to relegate these questions to juries has long been settled. The application of these rules of law to this case clearly authorizes its submission to the jury. The testimony does not present a record where all reasonable men must draw the inference either that the plaintiff was guilty of, or that the defendant was free from, negligence. The testimony is conflicting. It is probable that, if the mine owner in this case had sent an experienced,

suitable and competent person after the removal of the coal by Harris on Saturday evening to inspect the roof of this entry at that place, the defects would have been discovered and remedied; and, as to the contributory negligence of decedent which is complained of, in view of the fact that he was primarily employed as a tracklayer by the day—at $1 a day— and it not being his special duty to see after the safety of the roof of the entry, we think he had a right to presume that the defendant had inspected and knew the roof from which this coal had been so recently removed to be reasonably safe. This work was performed in dark passages in the earth, with no light to guide decedent except the flickering rays of the small lamp in his hat, which rendered it specially difficult for him to have noted other than obvious defects." See, also, the cases of Crabtree Coal Mining Co. v. Sample's Adm'r, 72 S. W. 24, 24 Ky. Law Rep., 1703, and McFarland's Adm'r v. Harbison & Walker Co., Southern Department, 82 S. W. 430, 26 Ky. Law Rep., 746.

In view of the facts stated and the authorities cited, I am compelled to dissent from the opinion of the court delivered in this case.