## Chesapeake & Ohio Railway Company v. DeAtley.

(Decided June 19, 1914.)

### Appeal from Mason Circuit Court.

1. **Master and Servant—Injury to Servant—Proximate Cause— Question for Jury.**—Where plaintiff, a brakeman, in attempting to board a moving train, was thrown beneath the train and injured, the question whether or not the speed of the train was the proximate cause of plaintiff's injuries, was for the jury.

2. **Master and Servant—Injury to Servant—Assumption of Risk.— Contributory Negligence—Distinction.**—Assumption of risk rests upon the intelligent acquiescence and knowledge of the danger and appreciation of the risk naturally incident to the employment or arising from a particular situation in which the work is done. It negatives the prima facie liability of the master, and does not involve the aggravation or creation of the peril by misconduct of the servant. On the other hand, contributory negligence rests on the breach of duty to exercise ordinary care. It displaces the prima facie liability of the master, adds a new danger to the situation not necessarily incident to the work, and is imposed by law upon the servant, however unwilling or protesting he may be.

3.  Master and Servant—Assumption of Risk—Volenti Non Fit Injuria.
    —Assumption of risk is generally held to grow out of the con-
    tract of employment, and of the application of the maxim vo-
    lenti non fit injuria.
4.  Master and Servant—Knowledge of Danger—Appreciation of
    Risk.—The test of knowledge of danger is not the exercise of
    ordinary care to discover the danger, but whether the danger was
    known to or plainly observable by the employe.  The test of
    appreciation of risk is whether the servant understood the risk,
    or by the exercise of ordinary care ought to have understood it.
5.  Master and Servant—Assumption of Risk—Ordinary Risks—Ex-
    traordinary Risks.—The risks which a servant assumes may log-
    ically be divided into two classes:  (1) Those which are not
    created by the master's negligence, or the ordinary risks of the
    service; and (2) those which are created by the master's .neg-
    ligence, or the extraordinary risks.
6.  Master and Servant—Injury to Servant—Assumption of Risk—
    Instruction.—Where plaintiff, a brakeman 19 years of age, was
    directed by the engineer of his train to go forward to a tower
    for orders, and in attempting to board the engine as it passed,
    was thrown beneath the train and injured, and it appeared from
    the evidence that plaintiff had a right to be on the engine, and
    was facing the train and had a right to rely on the fact that the
    train was approaching at a reasonable rate of speed, and had no
    opportunity to observe its rate of speed except between the
    time of the passing of the front of the engine and the cab, where
    it was his purpose to get on, it was. not error to refuse an in-
    struction on assumed risk.
7.  Trial—Duty of Court to Correct Offered Instruction—Federal
    Practice.—Under the practice in the Federal courts, it is not
    error to refuse an instruction to which a party is not entitled,
    nor is the court bound to modify the offered instruction so as
    to bring it within the rules of law.

WORTHINGTON, COCHRAN & BROWNING for appellant.

ALLAN D. COLE and HOLMES & ROSS for appellee.

Opinion of the Court by William Rogers Clay, Com-
missioner—Affirming.

In this action for damages for personal injuries
against defendant, the Chesapeake & Ohio Railway Com-
pany, plaintiff, John DeAtley, recovered a verdict and
judgment for $9,050.  The railroad company appeals.

According to the evidence for plaintiff, he entered de-
fendant's service as brakeman on December 10, 1910.
At that time he was 19 years of age.  Prior to that time
he had made two trips as brakeman between Covington
and Russell for the purpose of becoming acquainted with

his duties and qualifying himself for the work. At the time of the accident, which occurred on January 22, 1911, he was head brakeman on train No. 95, a fast westbound manifest freight train. When the train reached Springdale, a point about six miles east of Maysville, the engineer told plaintiff to call the operator and see if he could get an order or the time on train No. 1. Train No. 1 was a fast passenger train from the east. The engineer wanted to know if his train had time to get into Maysville without danger from a collision with No. 1. Plaintiff was unable to understand the operator over the phone, and so reported to the engineer. Plaintiff then got into the cab of the engine, and the train proceeded to the coal docks, a point about 460 yards east of F. G. Cabin, where it stopped for coal and water. Plaintiff was then directed by the engineer to go forward to the F. G. Cabin and ascertain from the operator how much time they had on train No. 1. Plaintiff proceeded to the tower, made the inquiry of the operator, and was advised that the train had time to go on to Maysville. After acquiring this information, plaintiff went down to the platform in front of the tower. At that time his train was approaching. When it reached the platform he attempted to board the engine. He caught hold of the grab iron, and put one foot on the step. The speed of the train and his weight threw him loose, and his foot slipped off. The tender ran over his leg and cut it off. He thought that the train was running slow enough for him to get on. He could not judge the speed. The engine did not look to be running very fast. Plaintiff further stated that he had on a number of occasions been directed to walk ahead of his train to a telegraph office for orders, and board the train as it came by. On cross-examination he was unable to name a single place or instance where this had occurred.

For defendant the engineer testified in substance as follows: When the train left Springdale plaintiff went forward to throw the switch on to the main track. Then he requested plaintiff to call up the operator at F. G. Cabin and find out how train No. 1 was running. When the train reached the coal docks, it was stopped for coal and water. He did not at any time direct plaintiff to go to the tower, and did not know that he had gone there. Supposed that plaintiff had gone back to look over the train, as it was his duty to do. When he finished coaling his engine he called in the rear flagman with the usual

signal, to-wit: Five blasts of the whistle. After waiting a short time someone about 15 cars back gave him the signal to go ahead. He then started the train. He supposed the man who had given the signal was DeAtley. As a matter of fact, it was the conductor. When he got within about 300 feet of the tower he saw a man standing on the platform. Thought it was the operator with a message to hand to him. He crossed over to the fireman's side of the cab to take the message. When the train reached the platform he recognized DeAtley. Just at that moment plaintiff attempted to board the engine. Plaintiff caught hold of the grab iron, his foot slipped and he fell under the wheels. The emergency brakes were at once, applied, and the train stopped. The fireman stated that he was in the engine cab all the time after leaving Springdale. Did not hear the engineer direct plaintiff to go to the tower, and did not know that he had gone. After leaving the coal docks, he started firing. Just before the engine reached the tower the engineer called to him to catch a message. He started to lean out the window, and saw plaintiff try to board the train. The conductor says he was in the caboose until the train reached the coal docks. He then started towards the engine, with orders to the effect that train No. 1 was running ten minutes late. Did not reach the engine until after the accident occurred. Knew nothing in regard to the alleged order given by the engineer to plaintiff to go to the tower. When about 100 feet from the tower, and before he reached the engine, he saw plaintiff on the platform waiting for the train. The operator at F. G. Cabin stated that plaintiff came into his tower on the occasion in question, and asked: "Have you anything on No. 1?" Witness repeated the question to the dispatcher, who replied: "No. 95 has ten minutes on No. 1. We are expecting her back over here at Maysville." Witness repeated the answer to plaintiff. After remaining there a short time plaintiff left the tower. Saw plaintiff make a leap for the train and fall. He further stated that a "19 order" is executed by the chief dispatcher, and the operator is supposed to hand it on the engine for the engineer and on the caboose for the conductor. The train was running between ten and twelve miles an hour.

By instruction No. 1 the court told the jury in substance that if defendant's engineer directed plaintiff to go to defendant's tower, or knew that plaintiff was at the tower on business connected with the operation of

the train, then it was the duty of the defendant, its agents and servants in charge of the train, to exercise ordinary care to operate the train at such rate of speed as would not make plaintiff's attempt to board the train, under all the facts and circumstances, unusually hazardous, and if they believed that defendant, its agents and servants, negligently failed to perform said duty, and plaintiff was injured by reason of such failure, if any, the jury should find for the plaintiff. By instruction No. 2 the court told the jury that if they believed from the evidence that plaintiff went to the tower of his own volition, and that defendant's engineer did not know of his presence there, they should find for the defendant. Instruction No. 3 fixed the proper measure of damages, and instruction No. 4 presented in proper language the defense of contributory negligence.

The court refused to give the following instruction, offered by the defendant:

"The court instructs the jury that when the plaintiff, J. J. DeAtley, entered the service of the defendant railroad company, as brakeman, he assumed all the ordinary risks and hazards of that employment or occupation; and if they should believe from the evidence that the plaintiff's injuries complained of were the natural and direct results of any of said risks, then they must find for the defendant."

(1) It is first insisted that the evidence fails to show that the speed of the train was the proximate cause of plaintiff's injury. In this connection it is insisted that plaintiff's own evidence discloses the fact that his foot slipped off the step, and he was then thrown loose by his weight and the speed of the train. We think, however, it was for the jury to say whether or not the speed of the train was the cause of plaintiff's injuries; for his foot might not have slipped, or his hold on the grab-iron have been loosened, had it not been for the speed of the train.

(2) The principal error relied on is the failure of the court to give the requested instruction on assumed risk, though this defense was pleaded by the company.

It is conceded that the defendant company was engaged, and plaintiff was employed, in interstate commerce at the time of the injury. Therefore, the Federal Employers' Liability Act controls. The case is not predicated on a violation of any statute enacted by Congress for the safety of employees. That being true, the com-

mon law doctrine of assumed risk applies. In the recent case of Seaboard Airline Railway v. Horton, decided April 27, 1914, U. S. Adv. Ops. 1913, p. 635, this precise question was involved. The court, speaking through Mr. Justice Pitney, said:

"It seems to us that Sec. 4, in eliminating the defense of assumption of risk in the cases indicated, quite plainly evidences the legislative intent that in all other cases such assumption shall have its former effect as a complete bar to the action. And, taking Sections 3 and 4 together, there is no doubt that Congress recognized the distinction between contributory negligence and assumption of risk; for, while it is declared that neither of these shall avail the carrier in cases where the violation of a statute has contributed to the injury or death of the employe, there is, with respect to cases not in this category, a limitation upon the effect that is to be given to contributory negligence, while no corresponding limitation is imposed upon the defense of assumption of risk—perhaps none was deemed feasible."

The distinction between assumed risk and contributory negligence is not only recognized by the Federal Employers' Liability Act, but by the Federal and other courts of this country. Choctaw, &c. R. Co. v. McDade, 191 U. S. 64, 48 L. Ed. 96; B. & O. Ry. Co. v. Baugh, 149 U. S. 368; St. Louis Cordage Co. v. Miller (C. C. A.), 126 Fed., 495. In brief, the distinction is as follows: Assumption of risk rests upon the intelligent acquiescence and knowledge of the danger and appreciation of the risk naturally incident to the employment or arising from a particular situation in which the work is done. It negatives the *prima facie* liability of the master, and does not involve the aggravation or creation of the peril by misconduct of the servant. On the other hand, contributory negligence rests on the breach of duty to exercise ordinary care. It displaces the *prima facie* liability of the master, adds a new danger to the situation not necessarily incident to the work, and is imposed by law upon the servant, however unwilling or protesting he may be. Though some authorities hold that assumption of risk is not based upon contract, it is generally held to grow out of the contract of employment, and of the application of the maxim *volenti non fit injuria*. The test of knowledge of danger is not the exercise of ordinary care to discover the danger, but whether the danger was known to or plainly observable by the employee. The test of appre-

ciation of risk is whether the servant understood the risk, or by the exercise of ordinary care ought to have understood it. Rase v. Minneapolis, &c. R. Co. (Minn.), 21 L. R. A. (N. S.) 138, 120 N. W. 360. Notwithstanding this distinction, it is generally held that assumption of risk and contributory negligence frequently approximate where the danger is so obvious and imminent that no ordinarily prudent man would assume the risk of injury therefrom. Narramore v. Cleveland, &c. R. Co., 37 C. C. A. 499, 96 Fed. 298, 48 L. R. A. 68. In the case of Seaboard Airline Ry. Co. v. Horton, *supra,* the difference between assumed risk and contributory negligence is pointed out in the following language:

"The distinction, although simple, is sometimes overlooked. Contributory negligence involves the notion of some fault or breach of duty on the part of the employe, and since it is ordinarily his duty to take some precaution for his own safety when engaged in a hazardous occupation, contributory negligence is sometimes defined as a failure to use such care for his safety as ordinarily prudent employees in similar circumstances would use. On the other hand, the assumption of risk, even though the risk be obvious, may be free from any suggestion of fault or negligence on the part of the employee. The risks may be present, notwithstanding the exercise of all reasonable care on his part."

The distinction between assumed risk and contributory negligence is of great importance in cases arising under the Federal Employers' Liability Act; for assumed risk bars a recovery, while contributory negligence merely diminishes the amount of recovery.

The risks which a servant assumes may logically be divided into two classes: (1) Those which are not created by the master's negligence, or the ordinary risks of the service; and (2) those which are created by the master's negligence, or the extraordinary risks. Choctaw, O. & G. R. Co. v. Jones, 77 Ark., 367, 4 L. R. A. (N. S.) 837. The ordinary risks are those which are ordinarily and usually incident to the service in which the employee is engaged; thus, the employee assumes the risk of injury from simple tools; a brakeman assumes the risk of injury from the usual and necessary jerks attending the prudent operation of a train; and, unless otherwise provided by statute, he assumes the risk of dangers arising from the negligence of a fellow servant.

In addition to these ordinary risks, there are extraordinary risks not contemplated by the terms of the employment, but arising from the negligence of the master. Such risks are not ordinarily assumed by the servant. It is only where he has knowledge, actual or constructive, of the existence of the danger that he can be said to have assumed the risk. Union Pacific Ry. Co. v. O'Brien, 161 U. S., 451, 40 L. Ed. 766; Chicago, M. & St. P. Ry. Co. v. Benton, 65 C. C. A., 60, 132 Fed., 460; 1 Labatt Master and Servant, 638. These extraordinary risks usually grow out of a failure on the part of the master to use ordinary care to furnish a servant a reasonably safe place to work or reasonably safe appliances for work. The risk of injury from such unsafe place or such defective appliance the employee does not assume until he becomes aware of the disrepair or of the defect, and of the risk arising therefrom, unless the defect and risk are so obvious that an ordinarily prudent person under the circumstances would have observed and appreciated them. When, however, the employee knows of the defect and appreciates the risk, and continues in the employment without objection or without assurance that the defect will be remedied, he assumes the risk, even though it arise out of the master's breach of duty. Seaboard Airline Ry. v. Horton, *supra*. Viewing the facts of this case in the light of the foregoing principles, it is apparent that the risk was not one of the ordinary and usual risks incident to the employment. It was not shown, nor will we assume, that the contract of employment contemplated, or that it was customary, for brakemen to get on trains moving at a dangerous rate of speed. If it be true that the engineer knew of the presence of plaintiff at the tower, and therefore of the necessity of his getting on the train as it passed, it was the duty of the railroad company either to stop the train or to run it at a rate of speed that would have enabled an ordinarily prudent brakeman to get on with reasonable safety. If it failed to do this under the circumstances, it was guilty of negligence. That being true, it follows that if this be a case of assumed risk, it is an extraordinary risk growing out of the master's negligence. The instruction offered by the defendant applies alone to ordinary risks, and does not cover a case of extraordinary risk such as this. Under the practice in the Federal Courts, it is not error to refuse an instruction to which a party is not entitled, nor is the court bound to modify

the offered instruction so as to bring it within the rules of law. Catts v. Phalen, 2 Howard, 382; Buck v. Insurance Co., 1 Peter, 159, 7 L. Ed., 90; Haffin v. Mason, 15 Wall. 671, 82 U. S. 671, 21 L. Ed., 196. But even if it be assumed that the case is one where the trial court should have followed our practice and prepared or directed the preparation of a proper instruction covering the point attempted to be covered by the offered instruction: West Ky. Coal Co. v. Davis, 138 Ky., 667, 128 S. W., 1074; Crane v. Congleton & Bro., 116 S. W. 341; L. & N. R. R. Co. v. Harrod, 115 Ky., 877, 75 S. W. 233; the propriety of the court's action in refusing to do so depends on whether or not the question of assumption of extraordinary risk should have been submitted to the jury. The determination of this question depends or whether or not the speed of the train and the danger of getting on were so obvious that an ordinarily prudent person under the circumstances would have observed and appreciated them. The only circumstances from which his knowledge and appreciation of the danger can be inferred is the fact that the train was going about 12 miles an hour. On the other hand it appears that plaintiff was only 19 years of age, and had made but six or eight trips as brakeman. He had been sent to the tower. While there the train proceeded on its way. His duties required him to be on the passing train. If he failed to get on he would be left behind. He had a right to assume that the engineer would run the train at a speed that would enable him to get on in safety. He was standing facing the train. The train was going directly towards him. As said by this court in M. & B. S. R. R. Co. v. McCabe's Adm'x., 30 Ky. L. R., 1009: "It is a matter of common knowledge that one standing immediately in front of a coming train can tell nothing of its rate of speed until it comes quite close." Had the train in this instance been coming at a high rate of speed, doubtless this fact might have been more readily observed. Under such circumstances, however, it is well nigh impossible to tell the difference between a rate of from four to six miles an hour, when an ordinarily prudent brakeman might get on with reasonable safety, and a rate of from ten to twelve miles an hour, when it would be dangerous for him to do so. Being the head brakeman, plaintiff had the right to get on the engine. He could not tell with any reasonable certainty what the speed of the train was until the engine practically

reached him. His opportunity to observe was reduced to the fraction of a second which elapsed between the passing of the front of the engine and the cab, where it was his purpose to get on. In that space of time he had to observe and appreciate the danger, which would have been a practical impossibility in view of his expectation that the train would be going at a reasonable rate of speed, and of his reliance on that fact. The facts present a different case from that of ordinary switching in the yards. There a brakeman not only has an opportunity to observe the speed of the train, but the train not being about to depart, there is no urgent necessity for his getting on the train. Here plaintiff was placed in the predicament where he either had to get on the moving train, where his duties required him to be, or be left at a way station; and aside from his own statement, all the circumstances tend to show that knowledge of the speed of the train came to him so suddenly and unexpectedly that he did not have an opportunity to realize and appreciate the danger of getting on. We, therefore, conclude that the court did not err in refusing to give a corrected instruction embodying the theory of extraordinary assumed risk.

Judgment affirmed. Whole Court sitting.

Judge Carroll dissenting.

Dissent by Judge Carroll: "I dissent from this opinion because I think an instruction on the subject of assumed risk should have been given."