## Baltimore & Ohio Railroad Company v. Smith.

(Decided April 25, 1916.)

### Appeal from Jefferson Circuit Court (Common Pleas Branch, Second Division).

1. Master and Servant—Inspection of Appliances.—The mere inspection of railroad cars by employes who are charged with the duty of inspection is not conclusive evidence of the exercise of ordinary care on the part of the company to keep its cars and appliances in reasonably safe condition.

2. Master and Servant—Inspection—Weight to Which Evidence of is Entitled.—The evidence of inspectors is entitled to the same weight as would be the evidence of any other witnesses who testify that an appliance is in good condition, and no more. It is subject to be put in issue to the same extent as any other disputed fact in the case.

3. Master and Servant—Inspection—Sufficient Inspection Will Discharge Master From Liability.—When the master has exercised that degree of care that the conditions of the service demand, and care corresponding to the dangers of the employment, he has discharged his duty to the servant.

4. Master and Servant—Hand-hold on Cars—Sufficiency of Inspection.—An inspection that merely consists in looking at hand-holds as the inspector walks by the cars, does not satisfy the duty that the master is under to exercise ordinary care to see that they are in safe condition.

5. Master and Servant—Sufficiency of Inspection Question for Jury. —Generally speaking, it is a question for the jury to say whether the required care has been exercised in inspection when there are any facts or circumstances showing that this care has not been exercised.

6. Evidence—Weight and Sufficiency of for Jury—Number of Witnesses Not Controlling.—The jury has the right to accept the evidence of one witness in preference to that of several witnesses. The number of witnesses who testify to a fact is not ncessarily a controlling feature in determining the truth.

7. Master and Servant—Assumed Risk—Acting Under Instructions. —Where a servant is authorized by instructions to board a freight

train at a certain time and place, he does not assume the risk
of a defective appliance such as a hand-hold, if he is exercising
care for his own safety.

8.  Master and Servant—Master Not Insurer of Safety of Appliances.
    —The master does not insure the absolute safety of machinery
    or appliances which he provides for the use of his employes, nor
    is he bound to supply the best and safest, but is obliged to ex-
    ercise ordinary care to maintain appliances in reasonably safe
    condition.

9.  Master and Servant—Evidence—Res Ipsa Loquitur—Inference
    From.—The doctrine of res ipsa loquitur does not apply with the
    same fullness and weight in cases where the servant is in-
    jured by a defective appliance as it does in cases where a per-
    son not occupying the relation of servant is injured by an unsafe
    appliance.

10. Master and Servant—Evidence—Res Ipsa Loquitur—Application
    of.—When a servant seeks to recover for an injury growing out
    of defective appliances, the mere fact that the appliance breaks
    is not of itself sufficient to make out a prima facie case. There
    must be other facts or circumstances showing that the master
    knew, or by the exercise of ordinary care could have known, of
    the defect in the appliance.

GIBSON & CRAWFORD for appellant.

S. L. TRUSTY, EUGENE HUBBARD, NOGGLE & GRAHAM and
A. C. POPHAM for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Affirming.

In this action by the appellee to recover damages for
personal injuries sustained, as alleged, by the negligence
of the appellant railroad company, there was a judg-
ment in his favor for four thousand dollars, followed by
this appeal.

A somewhat extended statement of the facts is made
necessary on account of the grounds relied on for re-
versal, and so we will set them out before taking up the
reasons assigned by counsel for the railroad company
why a new trial should be ordered.

The appellee, Smith, was employed by the railroad
company as a telegraph operator at a station on its
road called Lavenia. So much of his evidence as it is
important to relate in detail is as follows:

"Q. Who employed you, Mr. Smith, to work for the
B. & O.? A. Mr. George Day, division operator of the
Baltimore & Ohio Railroad, at Pittsburgh. Q. What
were you employed to do? A. As telegraph operator.

Q. Mr. Smith, I will get you to state to the jury what he said to you at the time he employed you. A. He told me I would have to live at Layton; that that was the nearest place, and work at Lavenia; he told me there would be a freight train in there, usually about 10:30, in plenty of time for me to get to my work, and I could catch onto that freight train somewhere along there as I could, and go to my work. * * * He told me I could ride back on a passenger train. He gave me a pass between those two stations. Q. Between what two stations did he give you a pass, Mr. Smith? A. Layton and Lavenia; he told me I could catch a train that would come in on the third track along about ten o'clock every night. Q. What did he say to you with reference to the third track? A. He said there would be a freight train usually pull in on the third track to let a passenger train around—the fast passenger train was due about 10:30, and he told me there would be a train in there nearly every night. Q. What was the distance between Layton and Lavenia? A. About four miles. Q. When did you go on duty? A. I went on duty at twelve o'clock, and I had to catch this train, because if it wouldn't be in there, it was liable to come there. Q. Was there any other way to get there except on the train? I mean by that, was there any road? A. No, sir. Q. Did you get the train Mr. Day directed you to get, and at the time he directed you to get it, at the time you got hurt? A. Yes, sir; I got the freight train that pulled in on that slow track. Q. On this occasion, was it an extra train or a regular train at all times that he told you to get? A. An extra train. Q. Was it on time or not? A. Yes, sir. Q. Ahead of time? A. A little bit ahead of time. I got there about the time I usually did, and this train was there. Q. Prior to the time you were injured, I will get you to state whether or not you had ridden on a freight train, and boarded it at this place, for your work. A. Yes, sir; I had been there thirty days, and I rode nearly every night. Q. What part of the train? A. I rode all over it. I rode in the conductor's caboose, and I rode on the engine, and on the box car; anywhere I could catch on. They knew it was customary for the operators to ride. Q. Did this train stop as it went through there, or go very slowly? A. It was going very slowly. Q. Was that instruction given you by Mr. Day, who employed you? A. Yes, sir; he said I would have to

catch on this freight train that come in on that third track. Q. Mr. Smith, on the occasion that you got hurt, just tell the jury how the accident occurred. A. Well, I come out about 10:15 at night, and this train was pulling by, I caught hold of the hand-hold about five cars from the engine and made two steps, and when I attempted to step down on the stirrup, I had hold of the hand-hold; the hand-hold was fixed something like my cane, and when I caught hold of that hand-hold and pulled down on it, I aimed to catch the stirrup and the end of it pulled loose and come down. Q. What pulled down and came loose? A. The hand-hold pulled loose and came down; I hit the stirrup and missed it—didn't catch it, because this thing let my weight down and I missed the stirrup. Q. What become of your foot? A. It landed right in front of the wheel—the moving wheel—and mashed the front end of my foot off. Q. Did this hand-hold—did I understand you to say this hand-hold pulled loose and came down at the time you threw your weight against it? A. When the hand-hold pulled down—not pulled loose—but pulled down and caused me to miss my footing. Q. Was your whole weight thrown against it? A. Yes, sir. Q. How fast was this train going? A. Well, not over five miles an hour, I don't think; not over five miles; about five miles an hour. Q. About how many cars were in this freight train? A. Twenty-five or thirty anyway. Q. Why did you get on that train at this place? A. Why, because I was instructed to get on where I could, and I thought I had better get on right there. Q. How far was it, you say, from the engine—about how far? A. I would judge four cars back from the engine; up next to the engine. Q. Why couldn't you get the caboose? Why didn't you get the caboose sometimes, or why did you ride on different parts of the train? A. If I could have got the caboose before the train had been going too fast, I would have did so. This train was going too fast for me; I was afraid it would be, before I got down there; there were thirty cars, I guess, and if I waited for the caboose I was afraid I would get hurt. Q. Had you ridden on different parts of the train before this? A. Yes, sir; I rode on the engine and the caboose. Q. You had gotten on the train when it was moving, had you? A. Yes, sir. Q. Did the officers and employes of that train see you? A. Yes, sir; they would see me; I don't know

whether they seen me this night or not, but usually they seen me. Q. Is this the track Mr. Day told you to get the train on? A. Yes, sir; the third track—the slow track. Q. Now, Mr. Smith, would they stop the train for you at Lavenia? A. Yes, sir; they would have to stop the train, the freight train, to get out; because, before they could pull off of the third track onto the double track, or the single track, they would have to get permission from the operator at Lavenia to pull out. Q. You had no trouble getting off of the train when you got to Lavenia? A. No, sir.''

On his cross-examination he testified as follows: ''Q. You gave your deposition in this case on the 22nd of December, 1911, at my office, didn't you? A. Yes, sir. Q. I will ask you if this question wasn't asked you, and if you didn't make this answer: 'Q. Do you know what kind of a car it was that you attempted to board? A. No, sir. Q. What portion of the train was it in? A. Well, the fourth or fifth from the caboose; the fourth or fifth car. Q. Four or five cars from the caboose? A. Yes, sir; I think so. Q. On the left-hand side of the train in the direction it was going? A. Yes, sir; that is right.' That is what you said? A. No, sir; I didn't say caboose; I said the engine; it couldn't have been the caboose. Q. Weren't those questions asked you, and didn't you make those answers? A. I didn't say caboose; if he got it caboose, I said engine; he misunderstood me; I am positive it was the engine.''

He was shown a written statement signed by him a few months after the accident in which he said, in describing how the accident happened, ''I caught a hold of the hand-hold and missed the foot stirrup and my foot slipped over the rail and the wheels passed over my foot.'' The witness admitted signing this statement, but said he did not write it or read it himself; and that he was very busy at the time with his duties as telegraph operator and the agent of the company who read it to him did not read that part of the statement saying that his foot slipped causing him to fall under the train, and that he did not know that statement was in there when he signed the paper, but admitted telling the agent that his foot slipped after the hand-hold came loose. This was all the evidence for appellee except that in rebuttal he denied making statements attributed to him by witnesses for the company.

On the part of the company the conductor on the freight train testified that he did not know or hear of any trouble with the hand-hold. Several other witnesses, who were employes of the company, were inquired of as to statements made by appellee after the injury, and all of them said that he told them that his foot slipped, but did not say anything about a defective hand-hold. There is also a stipulation showing that regular car inspectors of the company inspected this freight train, at a place where it was customary to inspect trains, some two or three hours before the accident; and it was agreed that the inspectors would say on the trial that they inspected the cars in this freight train without finding any defective or unsafe hand-holds, and "that the method of inspection was to examine by inspection all the parts not necessary for the persons using the cars to catch hold of, and look at the hand-holds and grab-irons, and catch hold of those that could be reached from the ground, to ascertain whether any were defective; that if any defect was found in any of the parts, an immediate note of that was made by them in books which were thereafter kept as records of the inspection; that they made the following record of the condition of the cars in the train above referred to at the time in their own handwriting in books from which they were now testifying. They say that there were no defects in any of the cars inspected by them except the defects hereinafter noted as set out in the schedule opposite each numbered car. Where no defect is set out, none was found in the car."

Day, the man who employed appellee, after denying that he had instructed, or directed, or authorized appellee to get on freight trains and ride from Layton to Lavenia, said that he gave him a pass to ride on passenger trains from Lavenia to Layton, but told him that on returning to his work each day he would have to walk from Layton to Lavenia. That he could ride one way but would have to walk the other.

On this evidence the contention of the appellee is that he had a right under the instructions given him by his superior officer, to board the freight train at the time and place and manner he did, and that his injury was caused by a defective and unsafe hand-hold, the condition of which could have been discovered by ordinary care on the part of the company.

On the other hand, the defense for the company was rested on the ground that appellee was not authorized or instructed to ride on the freight trains, and hence in attempting to get on the train was a trespasser and assumed the risk of defective appliances. It is further contended that the hand-hold was not defective or unsafe, and even if it was, the inspection made by the company showed that it exercised ordinary care to maintain it in safe condition, and so there should have been a directed verdict in its favor.

It will be seen from the evidence that the appellee is the only witness who testified as to the cause that produced the injuries received by him, and it is urged that the evidence contradicts appellee as to the cause that produced the accident to such an extent as to make the verdict upon this issue so flagrantly against the evidence as to justify a reversal of the case.

The evidence thus relied on consists of the statements of employes of the company that appellee did not mention a defective hand-hold in relating how the accident happened, but attributed it to the fact that his foot slipped; and in the evidence of the car inspectors who said they did not discover any defective hand-hold, supplemented by the paper signed by appellee detailing the circumstances of the accident in which no mention is made of defective hand-holds.

In this, as in almost all cases of this character, the evidence on several issues is very contradictory, although there is no evidence as to the immediate cause of the accident except the testimony of appellee, nor is there any contradiction of the evidence of the inspectors except such as may be found in its insufficiency and in the circumstances attending the accident as related by appellee. In view, therefore, of the fact that there is no evidence showing that the car inspectors did not make the inspection testified to by them, it is said that their evidence showed that they exercised ordinary care in making the inspection, and this being so, there was no evidence that the company failed to exercise ordinary care in its effort to maintain this hand-hold in reasonably safe condition.

Passing for the present a more detailed examination of the sufficiency of the inspection made, we cannot agree that the mere inspection of cars by employes who are charged with the duty of inspection, is conclusive

evidence of the exercise of ordinary care on the part of the company to keep its cars and appliances in reasonably safe condition, or that the inspection made in this case is conclusive evidence of the fact that the hand-hold was not in a defective and unsafe condition at the time the inspection was made or at the time the accident happened. The evidence of these inspectors is entitled to the same weight as would be the evidence of any other witnesses who testified that an appliance was in good condition, and no more. It was subject to be put in issue to the same extent as any other disputed fact in the case, and if the evidence of appellee is to be believed, it is plain that the hand-hold was in a defective and unsafe condition and that it had not been sufficiently inspected.

It is very true that when a railroad company exercises that degree of care that the conditions of the service demand, and care corresponding to the dangers of the employment, to keep its cars and appliances in reasonably safe condition for the use of its servants, it has discharged its whole duty. But whether it has performed its duty in this respect is an issuable fact, and when it is put in issue, if there is evidence, direct or circumstantial, showing that the accident would not have happened except for a defective appliance, the jury have the same right to weigh and consider the evidence supporting and opposing the proposition, that the company exercised due care, that they have to weigh and consider any other issuable fact in the case.

In Huddleston's Admr. v. Straight Creek Coal & Coke Co., 138 Ky. 506, the coal company proved by its mine boss that he inspected, shortly before the accident to Huddleston, the roof of the entry at the place the slate fell; and in the argument of the case the contention was made by counsel for the coal company that as the uncontradicted evidence showed that the company, through its employes, exercised ordinary care to put the mine at the place Huddleston was killed in a reasonably safe condition, and as there was no known cause that interfered with or changed that condition between the time it was thus inspected and the time Huddleston was killed, the court properly directed a verdict in its favor. But, rejecting this view, the court said:

"Must the statement of Elswick be accepted as conclusive of the fact that the company fully discharged its duty to keep the mine in a reasonably safe condition, or was the question whether or not it performed this duty one for the jury to determine from all the facts and circumstances in the case? It can readily be seen that this is a most important question, not only as it affects the case before us, but as it will affect other similar cases in which a recovery is sought against the master for the destruction of the life of the servant based on the failure of the master to furnish the servant reasonably safe places or appliances. If the principle contended for by counsel for the company is correct law, then in every case involving a question like this the master will be absolved from liability if he can prove that the place or appliance was examined and inspected shortly before the injury and found to be reasonably safe for the use of the servant, and there is no evidence to disprove that the inspection was made, or to contradict the evidence of those who say that in making it they exercised ordinary care. If this is the law, then, when a servant is killed by a defective appliance or unsafe place, all the master need do to compel a verdict and judgment in his favor is to show by uncontradicted evidence that such an inspection as we have pointed out was made, and that no change had taken place or been made in or about the thing inspected between the time of inspection and the death, although the jury might be authorized to believe from the physical facts shown in evidence that the appliance or place where the servant was killed was not in a reasonably safe condition at the time of the accident. Thus the law would place almost certainly in the power of the master the means by which he could defeat an action and deprive the complaining party of the right to rely for his recovery upon the facts and circumstances that in the opinion of the triers of the facts might be amply sufficient to show that the degree of care required was not exercised. We cannot give our approval to a doctrine like this. The jury have the right to hear and consider, not only the evidence from the mouths of witnesses as to what they did and what was done, but they have also the right to hear and consider other evidence from witnesses who are qualified to testify as to the physical condition of the place or appliance before, at the time, and immediately after

the accident, and the jury may from the facts and circumstances thus proven be warranted in concluding that they are entitled to more weight than the personal evidence of the witnesses whose testimony was in contradiction of these facts and circumstances.''

Nor is the later case of Lile ·v. Louisville Ry. Co., 161 Ky. 347, in conflict with the Huddleston case. On the contrary, the Lile case was clearly distinguished from the Huddleston case on the facts.

The evidence of the witnesses who testified that appellee said his foot slipped, without mentioning the hand-hold, is entitled to weight. But the jury had the right to accept the evidence of appellee in preference to.. that of the witnesses for the railroad company; and although the weight of the evidence, as well as some of the circumstances developed in the case, conduces to show that the accident happened on account of appellee's foot slipping in the stirrup on the side of the car when he attempted to get on rather than on account of the defective hand-hold, we are not prepared to say that the finding of the jury on this issue is so flagrantly against the evidence as that the verdict should be set aside. In Howard v. Louisville Ry. Co., 32 Ky. L. R. 309, it · was said, and is pertinent here:

''The number of witnesses who testify to a fact is not necessarily a controlling feature in determining its truth, neither does the fact that their evidence may not be contradicted by word of mouth compel its acceptance as true. The jury have the right to disregard the whole or any part of the testimony of any witness, and it is their province to give such weight to the evidence as in their judgment and discretion it is entitled to. In considering the weight to which evidence is entitled, and the credibility that shall be attached to the words of the witness, the jury may, and often do, take into consideration the demeanor, the appearance, and the manner of the witness, and from these and other circumstances that come under their observation during the trial may conclude that the witness is not worthy of credit, or is not testifying to the truth, and disregard his entire testimony. * * * A stronger impression may be made on the juror's mind by what he sees than by what he hears. A juror can see as well as hear, and has the right to use his eyes as well as his ears in making up his mind what weight, if any, shall be given the evidence of a witness.''

It is further insisted that when appellee, in going to his work, attempted to board a moving freight train, not at the caboose, he assumed the risk of defective appliances such as an unsafe hand-hold. Whether he assumed this risk or not depends on the question whether he had, under his employment, the right and authority to get on this moving train at the time and place and in the manner described in his evidence. He was an employe of the company, and if he was directed by his superior officer to board this train and other freight trains, at the time and in the manner in which he was attempting to board this train, the company owed him the same duty to keep its appliances in safe condition that it would owe to any other employe, for example, a brakeman, whose duties might require him to board cars as appellee was attempting to do when he was injured.

Looking now to the evidence of appellee to learn whether he was acting within the line of his instructions, we find that he testifies very positively—although his evidence is contradicted by Day—that Day, who had authority so to do, instructed him at the time he was employed that he would have to live at Layton, as there was no place at which he could find board and lodging at Lavenia, the place at which he was employed to work. That Day gave him a pass on which he could ride on a passenger train from Lavenia to Layton early in the morning when his night's work was over, and that in returning to his work at night he could get on a freight train that passed Layton about 10:30 and ride on it to Lavenia. That he further told him that he could get on the passing freight, which ran slowly at Layton, as best he could and at any place he could. That in obedience to these instructions he had gotten on this 10:30 freight train at Layton every night except one during the thirty days he worked preceding the accident. That sometimes he rode on the engine, sometimes in the caboose, and sometimes on the freight cars, getting on the train as it passed as best he could.

Assuming as found by the jury that the directions and instructions testified to by appellee were given to him by Day, we think that he had the right, in the exercise of care for his own safety, to attempt to get on this freight train at the time and place and in the manner he did. He would not of course under the instruc-

tions have had the right to attempt to get on a fast moving train, or at a place at which it would not have been reasonably safe to have attempted to board the train; but according to his evidence the train was running at a speed of only four or five miles an hour, and except for the fact that the hand-hold gave way, he could and would have boarded the train with safety. In other words, the sole cause of the accident, according to appellee's version of the affair, was the defective hand-hold. And if this hand-hold was defective, as the jury must have found, the railroad company was remiss in the duty that it owed appellee, because he had the right, under the circumstances stated, to assume that an appliance like a hand-hold, which is attached to the side of a car for the purpose of assisting those who wish to board the car, was in reasonably safe condition for the use for which it was intended.

Upon the issues in the case the right of appellee to recover depended upon his establishing by sufficient evidence three propositions: First, that his instructions from a superior officer authorized him to get on this train at the place he made the attempt; second, that in his effort to board the train he was exercising ordinary care for his own safety; and, third, that his injury was caused by a defective hand-hold, the condition of which could have been discovered by the company if it had exercised the required care.

As to the first of these questions, we think, as stated, that the instructions of Day were broad enough to authorize appellee to attempt to get on this train at the time he did; and as to the second one, there is really no dispute that the train was running at such a slow rate of speed as that he could have boarded it with safety if the appliance furnished for his assistance had been in reasonably safe condition. As to the third, there was much conflict in the evidence, and we will now look into this feature of the case.

In Patton v. Texas & Pacific Ry. Co., 179 U. S. 658, 45 L. Ed. 361, the court, in speaking of the duty of the master in respect to furnishing safe appliances for the use of the servant, used this language:

"Neither individuals nor corporations are bound, as employers, to insure the absolute safety of machinery or mechanical appliances which they provide for the use of their employes. Nor are they bound to supply

the best and safest or newest of those appliances for the purpose of securing the safety of those who are thus employed. They are, however, bound to use all reasonable care and prudence for the safety of those in their service, by providing them with machinery reasonably safe and suitable for the use of the latter. If the employer or master fails in this duty of precaution and care, he is responsible for any injury which may happen through a defect of machinery which was, or ought to have been, known to him, and was unknown to the employe or servant.''

In New Galt House Co. v. Chapman, 124 Ky. 527; Lancaster's Admr. v. Central City Light & Power Co., 137 Ky. 355; Truesdell v. C. & O. R. Co., 159 Ky. 718, and in many other cases, this court has announced substantially, although in different forms of expression, the same rule.

Tested now by this rule and assuming that the handhold gave way in the manner described by appellee the question is did the evidence for the appellee show, with sufficient certainty to take the case to the jury and support the verdict, the failure of the railroad company to use reasonable care in equipping and maintaining the car, which appellee attempted to board, with hand-holds reasonably safe for the purposes for which they were intended? It is true that the mere fact that the handhold gave way, independent of any other circumstances showing its defective and unsafe condition, would not be sufficient to convict the railroad company of negligence, as it seems to be generally held that the doctrine of *res ipsa loquitur* does not apply with the same fullness and weight in cases where the servant is injured by a defective appliance as it does in cases where, for example, a passenger or other person not occupying the relation of servant is injured by an unsafe appliance. The rule announced by this court in Lile v. Louisville Ry. Co., 161 Ky. 347, and followed in Thomas v. National Concrete Construction Co., 166 Ky. 512, is in harmony with the weight of authority on this subject, and is thus stated:

''While some courts take the position that the doctrine of *res ipsa loquitur* never applies in a case of master and servant, yet it is generally held that the doctrine does apply in such a case, but in a more restricted sense than in a case of carrier and passenger,

because of the difference in the degree of care imposed, and in the character of defenses that may be made. * * * A master is not required to furnish the servant absolutely safe appliances with which to work. He discharges the full measure of his duty when he exercises ordinary care to furnish appliances which are reasonably safe. When, therefore, the servant seeks to recover for an injury growing out of defective appliances, the mere fact that a piece of machinery breaks is not of itself sufficient to make out a *prima facie* case. It must, therefore, appear that the master knew of the defective condition of the machinery, or could have known of it by the exercise of ordinary care. Therefore, it is generally held in a case of master and servant that the inference of negligence is deducible, not from the mere happening of the accident, but from the attending circumstances. * * * In Sherman & Redfield on Negligence, section 59, the rule, which has frequently been quoted by courts with approval, is stated as follows:

" 'It is not that in any case negligence can be assumed from the mere fact of an accident and an injury; but in these cases the surrounding circumstances which are necessarily brought into view by showing how the accident ocurred, contain, without further proof, sufficient evidence of the defendant's duty and of his neglect to perform it. The fact of the casualty and the attendant circumstances may themselves furnish all the proof of negligence that the injured person is able to offer, or that it is necessary to offer.'

"The rule has also been stated in the following language: 'There must be reasonable evidence of negligence, but when the thing causing the injury is shown to be under the control of the defendant, and the accident is such that, in the ordinary course of business, does not happen if reasonable care is used, it does, in the absence of explanation of the defendant, afford sufficient evidence that the accident arose from want of care on its part.' "

This does not mean, however, that in suits by the servant against the master the doctrine of *res ipsa loquitur* cannot be invoked in aid of the servant's cause of action. It only means that in cases of this sort its effectiveness is more restricted than in other cases. Or, as said by the New York Court of Appeals in Marceau v. Rutland Railroad Co., 211 N. Y. 203, 51 L. R. A. (N.

S.) 1221, a case presenting a question very much like the one here involved:

"While it is therefore the settled law that the maxim is applicable to any case where the facts warrant its application, it is apparent that the employe who invokes it against his employer encounters difficulties that do not hamper the wayfarer in a public place or the passenger in a common carrier's conveyance. * * * In the nature of things the injured employe who sues his employer must present a much higher degree of proof than is necessary in the case of a wayfarer or passenger. It is to be emphasized, however, that the difference is one of degree, and not of kind. * * *

"The employer is bound merely to the exercise of reasonable care in providing his employe with a safe place in which to work, with proper and adequate tools, appliances, and machinery, and with fellow employes competent for the tasks to which they are assigned. If the injured employe sues at common law and seeks to invoke the maxim, he must necessarily make proof of facts and circumstances which, under the common law, exclude every inference except that of the employer's negligence. * * *

"The same rule applies, in a modified degree, where the employe sues under the employers' liability act, as the plaintiff in this case has done. In such a case the plaintiff must establish facts and circumstances which, under the statute, would entitle him to recover in the absence of a sufficient explanation by the defendant, absolving him from the imputation of negligence."

Nor do we find anything in the leading Federal case of Patton v. Texas & Pacific Ry. Co., *supra,* in conflict with the views expressed in the Lile and Marceau cases.

When the company equipped the car with a hand-hold the duty of maintaining it in reasonably safe condition for use imposed on the company the duty of inspection, but, at the same time, the mere fact that the hand-hold pulled loose, standing alone and unsupported by other facts or circumstances, would not be sufficient to show negligence on the part of the company, because the company did not insure its safety. It merely agreed that it would exercise ordinary care to keep it in safe condition. And so it was essential that the plaintiff in making out his case should show by facts or circumstances the failure of the company to exercise this de-

gree of care. This link in the chain of evidence, that was necessary to show negligence on the part of the company, is, we think, supplied by the manner of inspection and the circumstances attending the transaction.

The exposed location and use of the hand-hold was such that a reasonably careful inspection could not well have failed to discover its defective or unsafe condition.

If it pulled loose when appellee took hold of it, it is reasonable to assume that it would have given way if the inspectors had taken hold of it with a view of testing its security. The outward appearance of the hand-hold might not have disclosed its unsafeness, but an inspection that merely consists in looking at hand-holds as the inspector walks by the cars does not satisfy the duty the company was under to exercise ordinary care to see that they were safe, and this it appears is the character of inspection that was made.

An instructive and pertinent case upon the point under consideration is Felton v. Bullard, 94 Fed., 781. In that case a brakeman in the service of the railroad was killed while descending from the top of a moving car by reason of the defective character of a grab-iron which broke off and threw him beneath the wheels. The defense of the company was that it had fulfilled its duty of inspection and therefore was not liable for the accident. In support of this theory it asked the court to charge the jury that "If the defect was latent—that is, one not visible—the defendant is not liable, if the injury occurred by reason of such latent or invisible defects." The trial court refused to so instruct the jury, and the Federal Court of Appeals, Judge Lurton writing the opinion, in commenting on this ruling of the trial court, said:

"The refusal to instruct in the words of the request is now assigned as error. There was evidence tending to show that neither the broken and rusted condition of one of the screws by which the grab-iron was held to the wood of the car nor the decayed condition of the wood surrounding this broken screw was visible from the surface. Indeed, the evidence strongly indicated that no mere visual inspection would have disclosed the dangerous condition of this grab-iron. But would a mere visual inspection of such an attachment be due and

reasonable inspection of such an instrumentality? Was no other inspection reasonable and possible, under the circumstances under which such cars are received and forwarded? Would a mere visual inspection of a car wheel be regarded as ordinary and reasonable? If the tapping of the wheel with a hammer would disclose by sound the presence or absence of a fracture which might not be disclosed to the eye, could it be said that so ready and accessible a test should not be applied? As much may be said touching the firmness and security with which the grab-iron was fastened to the end of this car. This grab-iron was one of the rounds in a ladder provided for the use of brakemen, whose duty called them more or less often to the top of such cars. The life of the brakeman may often depend upon the firmness with which such an iron is attached to the end or side of the car. Was there no other ready means of ascertaining whether it was properly and safely attached than a visual inspection? If the application of some force would disclose a dangerous weakness, ought not such a test to be applied? The plaintiff in error did not regard a visual test as alone sufficient, for the inspector says that his habit was to go up such ladders at one end of a car and down the ladder at the other end. Did he do that in this instance? If he did, did he do so in such a way as to throw his weight upon this particular iron, or upon the end of the grab-iron supported by the broken screw? If not, would such a test be feasible and calculated to disclose a broken screw or rotten wood? These were proper questions for the jury to consider, and it was not error to modify this request as was done.

"Neither was it error to refuse the request for an instruction to find for the defendant. This request was based upon the insistence that there was no evidence upon which the jury could reasonably find that the railroad company had been guilty of negligence. The inspector testified that he did inspect this car upon the day it was received, being the day before the happening of the accident. He says he did so by going up one ladder and down the other. He also testified that neither the condition of the broken screw nor of the wood into which it had been driven could be discovered by the eye. * * * Did he in truth and in fact test this particular grab-iron by any means likely to disclose its

weakness? * * * Did the inspection made involve any strain upon the weak end of this grab-iron? Did the inspector use this ladder at all? If so, did he use it in such way as to really afford a test of the firmness of its attachment? If the inspection made did not involve such a physical test as was feasible, and calculated to disclose just such an infirmity as existed, would not a jury be warranted in finding either that no physical test at all was made, or that, if made, it was so carelessly made as to be useless? The circumstances were such as that it was not error to take the opinion of the jury.''

We do not undertake to say how an inspection should be made, but, clearly as we think, appliances like hand-holds, that can easily be subjected by inspection to some test corresponding to the test to which they are put in practical use, should be subjected to such a test before the company can claim that it has fulfilled its duty of exercising ordinary care to maintain appliances like this in reasonably safe condition for the use for which they are intended. A hand-hold that for any reason is so insecure that it will pull loose when subjected to the use for which it was intended, is manifestly a very dangerous appliance, and it would be farcical to rule as a matter of law that such an inspection as was made by these inspectors satisfied the requirements of ordinary care.

The only reasonable inference from the evidence is that the hand-hold was unsafe and defective when the inspection was made, and that this condition could have been discovered by a proper inspection is plain. What caused the defect, or when it first existed, are not material inquiries, as we need not go beyond the time of inspection to speculate as to the cause that produced the unsafe condition. It is as much the duty of the master to exercise ordinary care in inspecting appliances used by servants in order that they may be maintained in reasonably safe condition as it is to exercise ordinary care to ascertain the sufficiency and safety of these appliances when they are first installed. What will answer the requirements of ordinary care either in equipment or in inspection depends on such a variety of circumstances and conditions that it must be left to be determined by the facts of each particular case. But, generally speaking, it is a question for the jury to say whether the required care has been exercised when

there are any facts or circumstances showing that it has not.

Our conclusion, therefore, is that there was sufficient evidence and reasonable inference therefrom to show negligence in the inspection, and this, in connection with the fact that the hand-hold pulled loose, was enough to take the case to the jury on the issue that the appliance was unsafe and its condition could have been discovered by the company if it had exercised ordinary care.

The remaining question is the sufficiency of the plea of limitation to bar a recovery. The accident resulting in the injury complained of occurred in 1909, and in March, 1911, within two years thereafter, the appellee brought this suit to recover damages. In his petition he alleged that the defendant company operated passenger and freight trains over its line of road in the states of Maryland, Virginia, Pennsylvania and elsewhere, and that at the time he received the injury complained of he was employed by it as a telegraph operator. He further set up the identical state of facts upon which the case went to trial when the judgment was recovered from which this appeal was prosecuted. The plea of limitation authorized by the State law was interposed to this petition and sustained by the lower court; but on appeal to this court the judgment of the lower court was reversed and the case remanded for trial. Smith v. Baltimore & Ohio R. Co., 157 Ky. 113.

On the return of the case to the trial court the plaintiff filed an amended petition increasing the sum asked in damages, but not changing in any material way the nature of his cause of action as stated in his original petition. Thereupon the railroad company filed an answer setting up that at the time of the accident it was engaged in inter-state commerce and the appellee was employed by it in such commerce, and pleaded and relied on the two year statute of limitation fixed in the federal statute for the commencement of actions under the Employers' Liability Act.

There is some confusion as to the pleadings in the case after it went back from this court for trial, but there is no dispute that issues were made and tendered sufficient to bring the case under the Federal Employers' Liability Act, and the contention now is that as the amended pleading that first expressly set up the inter-

state nature of the employment and the right of recovery under the federal act was filed more than two years after the accident occurred, the right of recovery was barred by the federal statute fixing the time in which action of this character must be brought at two years.

The original petition, which was filed within two years from the date of the accident, although it did not show specifically that the suit was brought under the federal act, set up, as we think, facts showing that the railroad company was engaged in inter-state commerce and that the appellee was employed by it in such commerce; and so we think that the original petition stated sufficiently a cause of action under the federal act. But if we should be mistaken about this, and it should be held that the amended petition, showing in terms that the cause of action arose under and was prosecuted under the federal act, was not filed until two years after the accident, the plea of limitation was not available. In C., N. O. & T. P. Ry. Co. v. Goode, 163 Ky. 60, we had before us the question that is here presented, and after referring to the cases of Missouri, K. & T. Ry. Co. v. Wulf, 226 U. S. 570, 57 L. Ed. 355, and St. Louis, S. F. & T. Ry. Co. v. Seale, 229 U. S. 156, 57 L. Ed. 1129, we said:

"On the authority of these cases we think it is clear that, when the cause of action arises under the federal statute but suit is brought under the State law, or by some person not authorized to maintain an action under the federal statute, defects in the original petition may be cured by an amendment that does not set up a new and distinct cause of action, filed after the expiration of two years from the accrual of the cause of action, as the amendment will relate back to the filing of the original petition." And the cases of Seaboard Air Line Ry. v. Koennecke, 239 U. S. 352, 60 Law Ed...........; and Kansas City Western Ry. Co. v. McAdow, 240 U. S. 51, 60 Law Ed..........., support this ruling.

Wherefore, the judgment is affirmed.