# Big Sandy Cumberland Railroad Company v. Measell's Administrator.

(Decided March 20, 1931.)

(As Modified on Denial of Rehearing November 10, 1931.)

572

JOHNSON & HINTON and HOLT & HOLT for appellant.

A. F. CHILDERS and J. J. MOORE for appellee.

OPINION OF THE COURT BY CHIEF JUSTICE LOGAN—
Affirming.

Webster G. Measell was a young man twenty-five years of age, a resident of Norfolk, Va., and employed by the Big Sandy & Cumberland Railroad Company as a transitman in the construction of a tunnel in Pike county, Ky., during the latter part of 1928 and up to February 5, 1929, on which latter date he was killed by the falling of a large stone in the heading of the tunnel. The railroad was a narrow gauge, and located on Knox creek in Pike county and connected with the Norfolk & Western Railroad Company at Devon across Tug river in West Virginia. The company undertook to convert the road into a standard guage and obtained new rights of way for that purpose, and on the new rights of way it was necessary to construct a tunnel 1,600 feet in length extending from Tug river through the hill to the Knox Creek Valley. The construction work was new construction and not a repairing of the old lines.

A. F. Childers was appointed administrator of the estate of Measell, and he instituted this action against the railroad company to recover for his death. The petition alleged that Measell, acting under orders given by persons employed by the railroad company superior to him in authority, went into the tunnel to do certain work in connection with his duties, which work was the locating of certain points within the tunnel for the use of workmen engaged in its construction, and that while performing this work a large rock weighing several tons fell from the roof of the tunnel or the arc, striking

Measell and crushing the life out of him instantly; that the railroad company, and its employees in charge of the work and of the inspection and supervision of the work, carelessly and negligently allowed the tunnel to become in a dangerous condition to the workmen by reason of loose and overhanging stones; that it failed to brace, or support, the roof or arc to prevent falling stones or debris, and that by reason of that negligence Measell lost his life; that the company failed to make proper investigation to ascertain the dangerous condition existing, and if inspection had been made the danger would have been ascertained, and that by reason of the failure to inspect and its failure to brace the roof and arc as the work and construction progressed the danger was created which resulted in the death of Measell; that Measell did not know of the danger existing and was not charged with any duty of inspecting the tunnel, and that he was killed in the performance of the duties assigned to him by his superior officer.

The company filed a demurrer, and, without waiving it, filed its answer. It denied that Childers was the administrator of the estate of Measell and denied all of the acts of negligence alleged in the petition. There was a plea of contributory negligence and assumption of risk, and that the falling of the rock which resulted in the death of Measell was one of the ordinary risks incident to such work, which could not have been avoided by the exercise of ordinary care on the part of the company, or its agents. There was a further plea that Measell was engaged in and in charge of the work of making the place where he was working a safe place in which to work, and that he was engaged in, and in charge of, work necessary to guard against the inherent dangers incident to such work of which dangers Measell had knowledge, and that by reason of his being engaged in the work of making the place where he worked safe he assumed all of the risks incident to the work.

Appellee filed a demurrer to the answer and without waiving it filed his reply, which is a traverse of the affirmative allegations in the answer. An amended petition was then filed with the permission of the court, in which it was alleged that Measell was inexperienced in the particular work which he was assigned to do by his superior; that the company negligently failed to provide him a reasonably safe place within which to perform his duties or to inspect the heading of the tunnel and to take

down loose stone, slate, or other debris that was not securely fastened and which was likely to fall, or to securely prop them so as to prevent their falling; and that it was not the duty of Measell to inspect the heading or to take down loose stone, slate, or other debris or to prop them to prevent their falling. The amended petition alleged more in detail that the company negligently failed to provide Measell a safe place in which to work.

The jury returned a verdict in favor of appellee for the sum of $25,000, and judgment was entered thereon after the court overruled a motion for a new trial.

Counsel for appellant rely on six separate grounds for a reversal:

(1)  Excessive damages.

(2)  That appellee had no right to maintain the action.

(3)  Prejudicial rulings by the trial court in the admission and rejection of evidence.

(4)  That no negligence on the part of appellant was proven.

(5)  That Measell was guilty of contributory negligence.

(6)  That Measell assumed the risks incident to the work which he was doing at the time.

We will take up the fourth ground first, as it is most important. If there was no negligence proven, there would be no reason to pass on the other questions. The consideration of this ground requires an analysis of the evidence. The railroad company let the contract to construct the tunnel to J. V. Boxley & Company. They did the actual work, but the railroad company had engineers to inspect and supervise the work as it progressed. Measell was one of these engineers performing the duties of a transitman. A transitman in the engineering force holds a position next in rank above a levelman. He is called a transitman because he uses a transit, which is an instrument by which points and distances are located and measured. He has supervision over the particular work of which he is in charge. Above him in rank is the resident engineer, the assistant engineer, and the chief engineer. It is important to have a clear understanding of the nature and details of the work in which Measell was engaged at the time of his death.

This calls for a clear understanding of the methods of constructing a tunnel, and a separation of the duties of the contractor and the supervisory work of the railroad company. A tunnel is constructed in sections. The heading is the upper section of a tunnel described by an arc in this particular tunnel with a 12-foot radius. This means that the dimensions were about 24 feet at the base and 12 feet from the center to the top of the arc. The heading is driven first through the entire length of the tunnel. This might be called the upper half of the tunnel which consists of the heading and the arc extending down to the base, or what is known as the bench. The bench is the lower part of the tunnel underneath the heading and is taken out after the heading is driven through. It is 24 feet wide at the top and about 20 feet deep. When the tunnel is completed it has the appearance of a capital "U" turned upside down. The work which was in progress at the time of the death of Measell was that of driving the heading, and the distance that the heading had been driven from the portal at the Tug river end was 413 feet. The face of the tunnel at the time was 413 feet from the Tug river portal. The "portal" is the place where the tunnel enters the ground, and the "face" is the wall at the other end of the tunnel which must be removed as the heading is driven further in the direction in which the tunnel is to extend. As long as the upper portion of the heading is solid and substantial and it appears that there is no danger that objects may fall from it, no timbering is necessary, or at least no timbers are put up until the heading has been driven through. If the roof becomes soft, or there are evidences of the probability of stone, or other substances, falling from it to the bench below, it is the proper practice to go back some distance from the point where the roof is apparently unsafe, and, starting under the solid roof, use timbering so as to have the timber set securely in solid rock where no danger of falls exist and in that way furnish adequate support to the extended portion under the soft roof which might fall. When the timbering has been carried forward to the working point then the driving is continued. The timbering should be carried as close to the face of the tunnel as possible not to interfere with the work of driving the tunnel. The purpose of timbering before the heading is completed is to make the working place safe.

When the heading has been driven to the pont 413 feet from the portal, further excavaton was stopped to allow timbering. The timbering was done by the contractor but in the manner directed by the engineering force of the railroad company. When the timbering was started they dropped back about halfway to the portal. The timbering was started at a point 208 feet from the portal and 205 feet from the face. When the timbering becomes necessary it is a slow process and slows up the work of carrying the heading forward and is used only when made necessary for the protection of those working in the heading.

In this instance the timbering was constructed in 15-foot sections. The first step necessary in constructing a section is to set wall plates on either side of the floor of the heading. A "wall plate" is a piece of timber 12 inches by 12 inches and 16 feet long placed horizontally along each side of the heading, and the timbering is constructed on these wall plates. It is necessary that the wall plates be carefully placed along the side of the heading so that the particular section of timbering may be brought into exact alignment with the preceding section, and the general line and grade of the heading as previously determined by the engineers, and they must also be in alignment with each other so that the timbering erected over them may be in exact alignment. The location of the wall plates must be in the exact place called for by the plans and this requires careful measuring. When the wall plates are laid they become the foundation upon which the rings, the lagging, and the packing are constructed. The "rings" are five segments of timbers 12 inches by 12 inches fitted into an arc with the ends resting on the wall plates at opposite sides of the heading. The "lagging" is the sheeting which forms the covering for the timbering when completed, and the "packing" is the loose rock fitted by hand into the space between the lagging and the sides, or surface of the heading which is intended to afford a solid contact between the timbering and the excavated surface.

At the time of his death Measell was engaged in supervising the work of placing the wall plates on the left side of the heading going into the tunnel. He was assisted by a rodman whose name was Burd, and the forman for the contractor and two negro laborers were also present. He found some difficulty in getting the wall plate properly adjusted, or in exactly the right spot.

It was his duty to ascertain, by measurements, the exact place where the wall plates should be located. It was also his duty to see that the wall plates were in the correct position, and that they were blocked at both ends horizontally and perpendicularly so that they would be kept in place. It was while he was engaged in having the left wall plate placed in exactly the right position that the rock from the roof fell upon him. Thirty feet of timbering had been completed at the time of the death of Measell. The next section, which would have been 15 feet of timbering, was started at 6 p. m. on that date at a point 10 feet from the completed section. This placed Measell 248 feet from the portal.

There was a coal seam in the heading which rose as the heading progressed. It had reached the top of the heading when it had been driven 413 feet and, by reason thereof, the roof was considered unsafe. Above the coal was a formation of sandstone. It had been known for some time that the coal would reach the roof at some future time in the process of excavating, and preparation for this reason for the timbering had been commenced about three weeks before the day of the accident.

While the shape of the heading is intended to be a perfect arch, that intention cannot be realized in blasting through solid rock, or any other substance. Excavating tunnels is not sculptoring and the method of driving a heading leaves an irregular, knobby, and indented surface. The rock which fell was in size about 13 feet in length by 3 feet in thickness, and 6 feet in width. Before it fell, at the point of the accident there was no more irregularity about the arch and heading of the tunnel than at any other given point. There was at that point nothing irregular, unusual, or out of the ordinary in the line of the tunnel, compared with other sections of the arch or heading of the tunnel, and in appearance it was about the same as at any other given point. The other side of the tunnel was similar in character. The cause of the falling of the stone which killed deceased, was ''a small soapstone seam'' between it and the rock above it. Mr. Porter, the resident engineer whose duty it was to inspect, and who did the inspection for the appellant of the tunnel, admitted that he had observed the presence of the ''soapstone seams'' at other points in the tunnel; ''that the firing of the shots,'' used in breaking up the sectional formation necessary to make

the tunnel, would ''shake the walls of the tunnel for a number of feet back on the occasion of each shot. After a shot would be fired for this purpose an inspection would be made back of the shot.'' Inspections subsequent to the one following the shot would be made only at ''points'' when there looked like danger back of where they were working. Mr. Porter stated that he saw the stone which caused the death of Measell within thirty minutes after it fell and it showed the presence of the ''soapstone seam.'' The stone which fell was ''sandstone,'' and before it fell he saw ''no cracks or crevices in the roof at that particular point more than usual.'' He made inspection at that point ''with a light and with this sounding bar.'' It was about 12 feet from floor to ceiling at that point before the rock fell, after the debris from the shots had been removed.

To get his relevant statements on the decisive issue accurate, we prefer to give here the questions asked of, and answered by, Mr. Porter:

''Q. Taking into consideration the massiveness of that stone it could not have been told with the rod whether it was loose could it?

''Q. Could it have been told? A. I don't know whether it could or not, it sounded solid.

''Q. And you don't know whether you could have discovered anything with that rod? A. *A rock that size, I don't think so.* . . .

''Q. And a stone that size, it wouldn't have been disclosed (by your examination) whether it was loose or not on account of its massiveness? A. I don't think so, no sir. . . .

''Q. To what extent did you make this inspection? A. With a light and with this sounding bar.

''Q. Well, did you inspect at regular intervals or just stop and inspect such things as looked like they might be dangerous? A. *I only inspected points where they looked like danger back of where they were working.*''

Porter testified he made the last inspection in the presence of Measell shortly before the falling of the rock resulting in his death. It cannot be insisted with any good reason that, even if it were Measell's duty to inspect the arch and overhead of the tunnel in the absence of Porter, the chief engineer, although the same had been inspected by Porter in his presence and pronounced by him to be safe, that it was the duty of

Measell again to reinspect the same, and that in failing to do so he assumed the risk.

It was the duty of the railroad company to furnish the deceased a reasonably safe place to do the work in which he was engaged at the time, considering the character and nature of the work in which he was engaged at that time. Porter's inspection was for the purpose of affording him a safe place to work. It was the duty of the company, by and through Porter as the person charged with the duty of providing a safe place for his work, not only to exercise ordinary care in the making of the inspection, but to use the usual, customary, and reasonably necessary instruments in the making of it, considering the condition and circumstances under which he was making the inspection. Moses v. Proctor Coal Co., 166 Ky. 805, 179 S. W. 1043; Huddleston's Adm'r v. S. C. C. & C. Co., 138 Ky. 506, 128 S. W. 589.

It is true that a number of witnesses, experts in their line, testified that the inspection made by Porter was the usual and ordinary inspection under such circumstances. Mr. Rust, the engineer who testified for appellee, stated that the better method of inspection in such cases was to use a scaling ladder so that the inspector might get close to the rock and be enabled by his closeness of vision to determine whether there was a parting between the rock projecting downward and the overlying mass. The purpose of the inspection was to ascertain whether there was present in the overhead rock, or other substance, which was calculated to fall because of the natural formation. A closer view, by the use of a scaling ladder on the part of Porter, might have disclosed the presence of the soapstone seam and the parting of the rock. Common knowledge teaches that a scaling ladder used in connection with the light and sounding bar which were used by Porter would have better enabled him to inspect and to ascertain the actual condition present. With his admission as disclosed by his quoted evidence that he did not know whether the method of inspection used by him was sufficient or not to enable him to know the real condition existing within the short space of time before the rock fell and killed deceased, considering the condition which was shown by the actual falling of the rock within the short time after its inspection, together with his knowledge that there were "soapstone seams" elsewhere in the tunnel, and considering the size of the rock which fell, and the dis-

tance between the light and sounding bar used by him and the "soapstone seam" above the fallen rock, it cannot be said that the evidence in behalf of the appellee did not bring this case within the prevailing rule. The court properly submitted the issue of fact on the question of negligence to the jury. As was held in the case of Broadway Coal Co. v. Southard, 144 Ky. 453, 139 S. W. 747, 749, and in the case of Angel v. Jellico Coal Mining Co., 115 Ky. 728, 74 S. W. 714, 25 Ky. Law Rep. 108, that there should be no construction of the law that needlessly allows the exposure of the servant to danger in the prosecution of the business of the master. It was said:

> "Humanity itself demands this much consideration by the employer for the lives and safety of his servants, and the greater the danger to the servant the greater should be the care and caution demanded by his employer."

It is argued that Porter inspected the roof and this particular rock within the hour of the accident. He did so not more than fifty minutes before Measell was killed, and it is probable that he had inspected it from time to time during the period of twenty-five days, but he does not claim that he made any inspection other than is above indicated, unless it was immediately after the rock was exposed by the blasting about twenty-five days before the accident. The establishing that the inspection was made is not always conclusive evidence of ordinary care on the part of the master, and this is particularly true when the physical facts contradict the findings on inspection. Baltimore & Ohio Railroad Co. v. Smith, 169 Ky. 593, 184 S. W. 1108, L. R. A. 1918F, 1205; Hartung v. Ten Broeck Tyre Co., 173 Ky. 155, 190 S. W. 677; Louisville & N. R. R. Co. v. Thomas' Adm'r, 170 Ky. 145, 185 S. W. 840; Carter Coal Co. v. Prichard's Adm'r, 166 Ky. 776, 179 S. W. 1038.

Since counsel for appellant cite no case on their brief in support of their contention that there was no negligence shown, we will not take the time to point out the many cases bearing on the duties of the master in reference to the inspection of such work, or the steps necessary to protect employees from falling stones, or other objects from the roof, or sides, of a tunnel or mine. One of the leading cases is that of Ashland Coal & Iron Co. v. Wallace, 101 Ky. 626, 42 S. W. 744, 43 S. W. 207, 19 Ky. Law Rep. 849. Another case is that of Interstate

Coal Co. v. Molner, 150 Ky. 321, 150 S. W. 372. Using these two cases as a basis, any citator will lead to subsequent cases where the same question has been discussed and decided.

We have not discussed the duty of the master, if necessary, to make the place reasonably safe by shoring the roof. It is argued by counsel for appellee that the shoring should have been started earlier, and that it was negligence to wait until the heading had been driven 413 feet before the shoring commenced. It is suggested that if the shoring had followed the face as closely as allowable this rock would have been held up by the timbers and never would have fallen. It is true that there was some evidence that the roof was unsafe, or at least the entire heading was timbered from the portal to the face beginning soon after this accident. But there is evidence enough without that relating to the failure to do the timbering as the work progressed, to make an issue triable by the jury.

In view of the conclusions expressed above it is unnecessary to discuss the *res ipsa loquitur* doctrine. Both sides have devoted considerable discussion to that doctrine in the briefs, but we pass it without entering into its consideration.

The first ground relied on for reversal is that the damages are excessive. Many cases are cited on the briefs of each party, but in the late case of West Kentucky Coal Co. v. Shoulders' Administrator, 234 Ky. 427, 28 S. W. (2d) 479, the question of excessive damages where the jury had returned a verdict for $30,000 was discussed at length. Rules stated in that case govern this case. No mathematical rule for the measurement of damages in such cases has ever been established by this court. The matter must be left to the discretion of the jury and its findings will not be disturbed if justified by the evidence before it. Measell was a young man sober, industrious, and physically and mentally sound. He was earning about $200 a month. We cannot say that the destruction of his power to earn money did not damage his estate as much as $25,000.

The second ground relied on for reversal is that appellee was without right to maintain this action. It is said by counsel for appellant that there is no order showing his appointment of appellee administrator of the estate of Measell. There is an order dated May 14, 1929, which recited that Childers appeared in court and made oath to the fact that Measell died in Pike county

and that his estate had a claim for damages against the railway company which had not been settled. The order recites that Measell was a citizen of Virginia at the time of his death, and that his death was caused and brought about by the negligence of the railway company in Pike county, and that no administrator had been appointed. Following this is the statement in the order that Childers executed bond as required by law in the sum fixed by the court, which bond was approved, and that Childers took the oath to administer the estate according to law. It is true this order does not, in terms, ask that an appointment be made, but it does disclose facts authorizing the appointment, and that the appointment was made is shown by that part of the order reciting that Childers executed bond and took the oath. In December following the order made on the 14th day of May which was after the suit had been filed, an order *nunc pro tunc* was entered in an attempt to cure the defect in the first order. If the first order was sufficient we need not consider the *nunc pro tunc* order. Section 3897, Kentucky Statutes, authorizes the county court to appoint some person other than one having preference if such an one apply for administration at the second county court from the death of an intestate. When Childers appeared in court and submitted an affidavit showing facts authorizing the county court to exercise its jurisdiction and the order shows that the county court did so and appointed Childers, it would be extremely technical to hold that the appointment was void because the order did not show that he specifically asked to be appointed. We think the first order was sufficient to establish the validity of the appointment of Childers as administrator. He came into court, stated the facts, and his appointment followed. The presumption is that an officer does his duty, and as the county court appointed Childers, nothing else to the contrary appearing, it will be presumed that he did so on his application. The jurisdiction to appoint administrators is exclusively vested in the county court. Administration should be granted in the county in this state where a nonresident of the state died intestate. We do not find any merit in the contention that Childers was not legally appointed. Neither do we find any objection raised to his appointment in the lower court. It is true it was denied in the answer that he was administrator, but there was no special demurrer to the petition and the question was not called to the attention of the trial court other than by the denial until after the trial

was completed. The denial that appellee was administrator of the estate of Measell was in the nature of a plea in abatement which should have been disposed of in the circuit court, and if that court was not called upon to decide the matter it cannot be considered on appeal. In the case of Higdon v. Wayne County Security Co., 154 Ky. 337, 157 S. W. 708, this court had a case before it where the plaintiff had alleged that it was a corporation and that allegation was denied by answer. Nothing further was done about it. It was said by this court that the denial that the plaintiff was a corporation only put in issue its capacity to sue, and that the objection if apparent on the face of the petition must be taken by demurrer, and if not apparent on the face of the petition it must be made by answer; but in either case if the objection was well taken there would be a defect of proper parties. It was said that the objection raised a matter in abatement and not in bar of the action, and if well taken it furnished a ground for an order of court requiring the additional parties to be made on pain of dismissal without prejudice, but was not ground for a judgment in bar. It was further held that as the plea was merely dilatory it should have been disposed of by the court before the case was tried on the merits, and as the defendant did not ask that it be so disposed of he could not take advantage of it in this court.

In the case before us the order appointing Childers was filed with, and made a part of, the petition. The defect, if any, therefore, appeared on the record and should have been taken advantage of by a special demurrer.

The third ground relied on for reversal is that the trial court ruled erroneously in the admission and rejection of evidence. We will notice some of the rulings of the court complained of by appellant. On cross-examination Porter was asked if he knew of any tunnels in that locality where no timbering was employed. His answer was in the affirmative. He was then asked to cite an example, and an objection was made to the question and sustained by the court. The ruling was proper. Whether some other tunnel had been timbered could have thrown no light on whether the tunnel in which Measell was killed should have been timbered. In addition, it was held that there was evidence of negligence aside from the question of whether the heading should have been timbered as the work progressed. Again the same witness was asked if he saw anything at the point of

accident which indicated to his mind that any timbering or other support was necessary. An objection was sustained to that question, and a little further on he was asked to speak of the comparative dangers of tunnel work and the average mortality rate of men engaged in that work. An objection was sustained to that question. The evidence had fully covered the appearance of the rock which fell and all the surrounding circumstances had been detailed by the witness, as well as other witnesses, and there was nothing prejudicial in not allowing him to state that he saw nothing which indicated to his mind that timbering, or other support, was necessary. We do not think it was proper to go into a comparison of the dangers incident to tunnel work, and the average mortality rate of men engaged in that work. It is said that appellee was allowed to show by the witness that two other men had been killed in the tunnel and that appellant should have been allowed to question the witness further about the dangerous character of the work. These matters were of a nonprejudicial nature and in the main we are in accord with the rulings of the trial court, but if there were any errors they were slight and not prejudicial to anyone. A question was asked Mr. Rust by counsel for appellant as to when the idea of getting up on a scaffold and looking for a soapstone seam "popped into his mind." The court property sustained an objection to that question as it was not material when the idea came to his mind. Counsel for appellant admits that their complaint about the admission and rejection of evidence may appear to be of little importance, but they insist that small things weigh on the minds of the jurors. But we cannot find any error committed by the court in the admission and rejection of evidence which indicates that the rights of appellant were prejudiced to any extent.

We have already discussed the fourth ground relied on for reversal, which was that no negligence had been proven, and we now come to the fifth, which is the alleged contributory negligence of appellant. It is admitted by counsel for appellant that contributory negligence cannot be presumed, but must be proven, and they also admit that there was no direct proof of contributory negligence and that ground was abandoned. But they say that if there is any place in this case to invoke the doctrine of *res ipsa loquitur* there might be a basis for an argument that the surrounding circumstances show by what happened that Measell was guilty of contributory

negligence. But as that doctrine is not material in this case we will not go into the suggested argument.

The sixth ground relied on for reversal is that Measell assumed the risk, and that is divided into two parts: one that he assumed the risks generally, and the other that he assumed the risks to a greater extent because he was engaged in making the working place safe. It is true, as argued by counsel for appellant, that an employee assumes all of the ordinary and inherent risks of a master's work and that the master is not an insurer of his employee's safety. The master owes the duty to furnish the employee a reasonably safe place in which to work taking into consideration the nature and circumstances of the work at hand, and this duty cannot be delegated. Kelly & Shields v. Miller, 236 Ky. 698, 33 S. W. (2d) 662. The master must exercise ordinary care to provide a safe place for his servant to work, and the servant does not assume the risks incident to his employment except upon the consideration that the master exercise ordinary care to make the place safe. If the master does not exercise ordinary care to afford a safe place in which the work may be done, the servant does not assume the risks which are created by reason of that failure on the part of the master, except in cases pointed out in Chesapeake & O. Ry. Co. v. DeAtley, 159 Ky. 687, 167 S. W. 933; Louisville & N. R. R. Co. v. Reverman's Adm'x, 228 Ky. 500, 15 S. W. (2d) 300; Consolidation Coal Co. v. Moore, 166 Ky. 48, 178 S. W. 1136; Chesapeake & O. Ry. Co. v. Proffitt, 241 U. S. 462, 36 S. Ct. 620, 60 L. Ed. 1102. If the master, therefore, failed to exercise ordinary care, as in this case, it cannot be said that the risks thereby created were assumed by the servant. We deem it unnecessary to cumber the record by a citation of cases announcing the doctrine just stated, but as illustrative of that doctrine we refer to Reffitt v. Sheet & Tin Plate Co., 170 Ky. 362, 186 S. W. 155; Chesapeake & O. Ry. Co. v. Shaw, 168 Ky. 537, 182 S. W. 653; North East Coal Co. v. Setzer, 169 Ky. 245, 183 S. W. 553.

Appellant relies on the opinion in the case of Smith's Adm'r v. North Jellico Coal Co., 131 Ky. 196, 114 S. W. 785, 28 L. R. A. (N. S.) 1266; Id., 135 Ky. 834, 123 S. W. 256, 308. In that case the decedent was employed in a coal mine to undercut coal. After he had undercut a quantity of coal, explosives were used by other men to dislodge it, and still others shoveled it away, cleared up the room, and pulled down any loose, or overhanging

slate. The shovelers had performed their duty and reported to decedent that the place was safe and, on his return to work, he was injured by falling slate from the roof. The roof of the mine was bad. If the place appeared to be dangerous it was the duty of decedent to order in props to strengthen it and prevent the slate's falling. He made no attempt to strengthen the roof, although he knew that the cutting out of a block of coal always increased the danger. The court held that the defendant was not liable, as it was not the duty of the master to furnish a servant with a safe place in which to work where the work which the servant was doing constantly made the place where he was working dangerous. We fail to perceive any application of the principles announced in that case to the one before us. The work which Measell was doing did not make the place where he was working dangerous, and had no tendency in that direction. The danger in case cited was obvious. Decedent knew of the danger. It was his duty to see that the necessary props were put in when there should be a necessity therefor. In the case before us the duty of making the place safe was not imposed upon Measell. He performed a minor part in the operation. He did nothing which resulted in making the place dangerous. He was a transitman who made measurements and whose duty it was to indicate the location of the wall plates. This was the extent of his duties in connection with the timbering of the tunnel. He did not set the timbers. He simply indicated where the wall plates should be located. If the rock had fallen because the wall plates had not been properly located, the doctrine announced in the case last cited might be applicable. He was only indirectly engaged in the work of making the place safe. Williams Coal Co. v. Cooper, 138 Ky. 287, 127 S. W. 1000.

Counsel for appellant rely on the case of Williamson's Adm'r v. Blue Grass Fluorspar Co., 156 Ky. 226, 160 S. W. 920, and they say that if appellee should escape from every other line of attack, yet there can be no escape from the principles announced in that case. In that case the decedent and other men with him were engaged in timbering up the mine so as to make it safe. It was said that men engaged in such work must understand that they are putting in the timbers to make the mine safe, and that the defect which had arisen bringing about lack of safety was a matter which could not have been detected by inspection. It was also said that if the master knows of any danger or has reason to know that

the place is dangerous for the work the employees are doing, he should give them warning of the danger. But it was found from the evidence that the master had no knowledge of the danger. What was really held in that case was that a master is not liable for the death of a servant who was killed by the falling of earth from the side wall of a mine caused by a slit in the earth back of the wall which ordinary care could not have discovered and guarded against. A very different state of facts was presented from those now under consideration. Measell's superior should have known of the danger, or may have discovered it by the exercise of ordinary care. He had inspected the rock a very short time before it fell. He gave no warning to Measell because he did not discover the danger, and he did not discover the danger because he did not make that inspection which the hazard demanded at the time and under the circumstances. Measell had the right to rely upon the superior knowledge of Porter. He had been present when Porter had inspected the rock, and he had a right to assume that Porter made the inspection in such a way as would show no failure to exercise ordinary care.

It is true that Porter testified that it was the duty of all of those working in the mine to make inspections. It was their duty, so he said, to do so although they were without any authority to do more than to call the attention of the contractor to what appeared to be dangerous. Measell was not called upon to make further inspection after Porter had made the inspection less than an hour before the rock fell. He was not engaged in making the place safe except incidentally. The primary duty of inspection was not imposed upon him. He did not assume the risks brought into the case by the negligence of the master. None of the cases cited by appellant in support of their contention that he assumed all of the risks because he was making the place safe are in point. The work of Measell did not cause the danger. The work which he did was only an incident in an effort to guard against the danger. We have given careful attention to all of the points raised by appellant, and we find none of them available to him.

Judgment affirmed.

Whole court sitting.