# Williamson's Administrator v. Blue Grass Fluorspar Company, et al.

(Decided December 3, 1913).

## Appeal from Crittenden Circuit Court.

Master and Servant—When Master Not Liable for Death of Servant.
—A master is not liable for the death of a servant who was killed
by a fall of earth from the side wall of a mine caused by a slit
in the earth back of the wall which ordinary care could not have
discovered and guarded against.

BLUE & NUNN and OLLIE M. JAMES for appellant.

GORDON & GORDON and COX and A. C. & V. Y. MOORE for
appellees.

Opinion of the Court by Chief Justice Hobson—
Affirming.

The Blue Grass Fluorspar Company operates two
mines in Crittenden County, known as the Taber and
Asbridge mines, situated not very far apart, and man-
aged by the same foreman. Urey E. Williamson, a la-
borer in the service of the company, on October 28, 1911,
was killed in the Taber mine and this action was brought
against the company to recover for his death. The
company had sunk a shaft from the top of the
ground about forty-three feet deep, and at the foot
of the shaft had run a level or passageway under
the ground for some distance. Near the end of the
level it had cut into the wall, and was cutting what
is called a side level which is a passageway parallel to
the original level, and running back in the direction of
the shaft. The side level had been cut for a distance of
about 8 feet; 4 feet of this had been cut 4 feet wide and
about six feet high; the other 4 feet was in the shape
of a smoothing iron, that is it was not cut out the full
width of 4 feet all the way. The material through which
they were cutting was clay. At the time of the trouble
they were timbering up the side level when some of the
clay at the top of one of the sides fell down on William-
son, and he was killed. Lehman Rushing was foreman
of the company. The plaintiff charged in his petition
that the place was in a dangerous condition; that this
was known to the defendant, or by ordinary care should
have been known to it; that being apprehensive of dan-

ger, the intestate sent word to Rushing to come down and see if the place was safe; that Rushing came down and pronounced it safe, and assured the intestate that it was safe; that relying upon Rushing's assurance, he continued at work, and was killed by reason of the negligence of the defendant in furnishing him an unsafe place to work. At the conclusion of the evidence for the plaintiff the defendant moved the court to instruct the jury peremptorily to find for it. The court overruled the motion; the defendant then introduced its testimony, and at the conclusion of all the evidence, the court on motion of the defendant instructed the jury to find for the defendant. The plaintiff's petition having been dismissed, he appeals.

The sum of the evidence on the trial is as follows:

Horace Williamson: "I am the father of Urey Williamson, he was 25 years old. He had been working off and on at the mines for about five years, just a few days at a time, when he had a chance to leave home out of his crops."

Earney Brashear: "This was the first day Urey Williamson had worked in that mine. Mr. Rushing came down there every two or three days. I do not think I sent for him; I had charge of the men there. He told us to go ahead with the side level. We took a hammer and sounded the roof; he was there and he said he thought it was safe. There was a place back in the old level he told us not to go back there. A piece of dirt fell while Rushing was there as large as a spittoon. At the time of the accident I was holding a corner board; Williamson was driving a nail he had made four or five licks with the hammer when the piece of dirt fell out weighing about 200 pounds. Williamson was killed." Cross-examined: "He was killed in the side level. Where he was killed the cap stick was about 8 feet. The mine tunnel was timbered opposite this place. We had diven the side level about 8 feet; we had room there for two sets of timbers; the timbers are set four feet apart. We dug out some of the side level the day before, and some of it three or four days before. The side wall was of blue dirt, and slanted up to the top. We could not have timbered the side level until we got room enough for two sets of timbers. We were timbering it up to keep it from falling. When we examined the top we did not detect anything loose; the piece that fell on him fell from the side and ran up to the top. No assurance

of safety was given by Mr. Rushing. I did not see any reason to expect danger. My judgment is the jar of the hammer caused the dirt to fall. The piece he was nailing rested against the wall; he was driving a twenty or forty penny nail.''

Re-direct: ''I was holding the timber he was driving the nail in.''

Fred Clements: ''I have had experience in mining in this county off and on for ten years. I was in the old Asbridge mine; was never in the Taber mine. I worked at the Pogue mine; they are adjoining property and in the same section. The wall and ground conditions in these mines are practically the same as a rule. As a general thing the walls along these veins are rotten; it does not take but a very short time to s ack after the air gets to it, it does not stand but a very short while. I would not consider it safe to work men under any of the ground unsupported by timbers. It is not reasonably safe in ground for a distance of eight feet unsupported by timbers if it is like the ground I worked along that vein at other places. You have to put men in there in order to get the posts set, but the cap leg goes over the top, and that is pushed forward to keep anything from falling, and as you dig out you push this leg up and keep it overhead. The general thing we run it on the side and when we get it far enough, we put the other posts in, that is, in very soft ground, where it looks like it is going to stand for a few minutes until we get the side cut out, and then we leg it up right afterwards. This protects the men from anything falling on them. The Pogue mine is only a half mile from the Taber mine. I was never in the Taber mine, and don't know the conditions there.''

This was in substance the evidence for the plaintiff. The defendant introduced the following evidence:

Lehman Rushing: ''I was at the Taber mine about an hour before Williamson was killed. I had four mines in charge and visited them in rotation; no one sent for me. I told Brasher not to work in the old level. Some of the boys were sounding the roof while I was there. Nobody called on me to examine it or pass any opinion on it, and I did not say anything about it. Williamson did not say a word to me. He had been working for me six or seven months off and on. He would be out a week at a time, in and out. I am familiar with the Pogue mine; that is wet work. The Taber mine is dry work.

We have never had any water in there. We had to shoot the clay to get it out. Two sets of timbers could not be placed in the side level without more shooting and digging out. The work had been done that week. The side level was timbered as soon as they could get it back far enough to timber. There was no evidence of any slacking in the walls. I did not see anything indicating that a piece of dirt would fall from the wall. The widest place where the top was exposed was two feet. The rest of it was this blue dirt that went down to the floor, and then at the floor it was four feet wide. The blue dirt wall looked as smooth as glass at the place where it subsequently fell out. There was nothing to indicate that there was danger of its falling. I saw the place afterwards; it appeared to have a little slack seam behind it; a fellow could not have seen this in any way at all. I had no means of ascertaining that that piece of blue dirt had a slit in it which would let this blue dirt fall out on a person.''

Cross-examined: ''I could not have told this if I had investigated and nobody else could. The seam was behind the dirt that fell. I did not see that there was anything out of the way or wrong; there were no cracks; the wall was smooth.''

Henry Taber: ''Mr. Rushing did not assure Williamson or any of the other men that the roof or sides were safe. We had started in to timber the place; the dirt fell right by me. This was dry work. The spar level is hard; the blue dirt is hard and we had to blast it. I was holding the piece Williamson was nailing the corner board to. I saw the material fall; it fell off the wall kinder over his head. He was driving a nail in that corner board and through the corner board into the post at the top of the post. The top of the post rested against the wall; there was nothing to indicate that the dirt was going to fall before it fell. I could not tell what caused it to fall unless it was the jarring of the hammer. Brasher did not send for Rushing.''

This is the substance of the testimony given on the trial, except some rebuttal evidence by the plaintiff to the effect that Henry Taber had stated before the trial that Brasher had sent for Rushing to come down and see if the place was safe; and this was only competent to affect his credibility as a witness.

The record does not show upon what ground the circuit court gave the peremptory instruction, but we

suppose it was upon the ground that the evidence showed that there was nothing in the external appearance of things to indicate danger of the walls slipping, and that the fall of the clay was an accident which ordinary care could not have guarded against. The master is not an insurer of the safety of his servant. It is, however, his duty to use ordinary care for the servant's safety, and he is liable where the servant is injured by a defect in the place of work, when he knows, or by ordinary care should have known, of the defect. The evidence does not show that Williamson or any one else complained to Rushing that the walls were dangerous. It does show that when they sounded the walls that Rushing said that he thought that they were safe. There is a conflict of evidence on this subject, but this would be a question for the jury if the case was otherwise made out. The master must timber up his mine and use ordinary care to keep it reasonably safe for the use of his servants; but he must have men to timber it up. The deceased and the men with him were engaged in timbering up this mine so as to make it safe before other digging was done. The master when he sends out one set of men to timber up a mine, is not required to first send out another set of men to make the mine safe for them. Men engaged in such work must understand that they are putting in the timbers to make the mine safe. If the master knows of any danger, or has reason to know that the place is dangerous for the work they are to do, he should give them warning of the danger; but the uncontradicted evidence for the defendant shows that there was back of the walls a slit in the clay which could not be detected by an inspection of the entry; and this slit in the clay caused the earth to fall out when Williamson hammered upon the post leaning against it. The danger was a hidden one unknown to the master and not discoverable by ordinary care according to the uncontradicted evidence for the defendant. The testimony of the witness, Clements, to the effect that the timbering should be done as the digging progressed, seems to have little application here, for the reason that no digging was going on. Everybody concerned in the work knew that they were timbering up the entry before beginning to dig further. His testimony, too, seems to relate entirely to ground that was wet, and the uncontradicted evidence of all the witnesses is that this ground was dry. We, therefore,

conclude that the circuit court was warranted in holding as a matter of law that the defendant could not by ordinary care have ascertained the danger, and that the trouble came from an unexpected and hidden defect in the clay.

Judgment affirmed.