## Green's Administrator v. C. & O. Railway Company.

(Decided October 24, 1922.)

## Appeal from Greenup Circuit Court.

1. Master and Servant—Interstate Commerce—Injury to Employe Engaged In.—An employe of an interstate railroad engaged in interstate commerce may maintain an action for damages against the company in every case where he suffers injury while employed by such carrier in interstate commerce, which injury results in whole or in part from the negligence of any of the officers, agents or employes of such carrier, or by reason of any defect or insufficiency due to its negligence in its cars, engines, appliances, machinery, tanks, roadbed, yards or works.

2. Master and Servant—Action for Personal Injuries—Signals.—A brakeman or follower of a switch engine operating in the yards and whose duty it is to couple and uncouple cars, give and receive signals and perform other duties about the engine and who is injured while in the performance of his duties as an interstate employe through the negligence of the engineer, foreman, yard master or conductor of the train, is entitled to recover damages of the railroad company for such injuries.

3. Master and Servant—Negligence.—It is gross and inexcusable negligence for a railroad company to place cars at the intersection of a switch so as to make it unsafe for train operatives to pass on an adjacent track; especially is this true when the injured employe has not been in the yards during the night of his injury nor had he placed said car at said intersection, nor knew of its position there.

4. Master and Servant—Negligence.—Although an interstate employe of a railroad company be guilty of negligence which helped to bring about his injury, yet he is entitled to recover damages of the railroad company if it satisfactorily appear that the other employes of the company with whom he was engaged in work were guilty of negligence which contributed to his injury.

5. Master and Servant—Instructions.—It was error of the trial court after allowing the introduction of evidence proving the foregoing facts, to direct the jury to find and return a verdict for the company.

S. S. WILLIS, A. R. JOHNSON, A. D. COLE and D. E. ERNEST for appellant.

WORTHINGTON, COCHRAN & REED for appellee.

OPINION OF THE COURT BY JUDGE SAMPSON—Reversing.

Charles Green was engaged as one of a switching crew in the Russell yards of the C. & O. Railway Com-

pany when he was caught between the end of the moving tender on which he was working and the end of a standing a box car on a switch which box car barely cleared the tender, and crushed so that he immediately thereafter died. His administrator brought this action under the Federal employers' liability act in the Greenup circuit court to recover damages for his death. It is admitted by both the company and the administrator of Green that Green was at the time of his injury engaged in interstate commerce. The Federal act in part reads:

"Every common carrier by railroad while engaged in commerce between any of the several states or territories or between any of the states and territories . . . shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce, . . . *resulting in whole or in part* from the negligence of *any of the officers, agents,* or *employes* of such carrier, or by reason of any defect or insufficiency due to its negligence in its cars, engines, appliances, machinery, track, roadbed, ways or works."

At the conclusion of the evidence for plaintiff, the court on motion of the railway company peremptorily directed the jury to find and return a verdict for it, and this appeal is prosecuted from a judgment entered upon that directed verdict.

While the evidence is very voluminous we think it may be stated in outline so briefly as to compress it into few lines and yet serve the purposes of this opinion. The switch crew was engaged in taking cars brought into the east end of the yards from various points and putting them over the knuckle which was near the middle and the highest point in the yards, which knuckle was intended to cause the cars to move by gravity on to the various tracks on the west end called the classification yards. The crew in charge of the engine consisted of a yard foreman, a conductor and engineer, fireman and a follower of the engine. Deceased, Charles Green, held the last mentioned position and was required to ride on the footboard of the tank connected with the engine and to couple and uncouple cars, give and receive signals and perform other duties about the engine. The work of moving cars over the knuckle had been proceeding continuously for several hours during the night and some of the tracks in the classification yards were congested. The classification yard is shown in the record by the following map:

Number 10 was a lead track from which all the other tracks, either directly or indirectly, led off; track No. 4 was congested and would not receive other cars until those standing on it were pushed further west, and track No. 10 was full up to and past the entrance to tracks Nos. 8, 7 and 6; there was standing at the entrance of track No. 7 a car which was not more than three, four or five inches from the tank of a passing engine on track No. 10. In other words, this car did not have sufficient clearance at the switch to allow the safe passage of a man on the side of the tank of the switch train, and this fact was known to the foreman of the yards and also to the conductor of the train, each being superior in authority to decedent Green, for these two superior servants of appellee had visited this part of the yards for the purpose of inspecting the same and discovering what work was required in order to so place the cars as to make room for other cars yet to be put over the knuckle. In addition to the train crew above referred to, there were several other men engaged at the knuckle, some to operate the levers which controlled the switches in the yard and others to ride the cars after they had been put over the knuckle and kicked down the gravity switch, and while riding the cars to so operate the brakes as to prevent a destructive collision with cars already on that particular switch. On discovering that tracks Nos. 4, 7 and 10 of the classification yards were congested the yard foreman directed the switch crew, including decedent Green, to bring the engine across the knuckle on to the classification yards for the purpose of pushing the cars further down the tracks upon the several switches, and thus make room for other cars yet to be put over the knuckle. Pursuant to this order the engineer and train crew came across the knuckle and went down on switch No. 4, and pushed the cars thereon down the switch to make room for other cars on that switch. The engine then went back east to the main track near the switch tower and then, according to orders from the yardmaster or the conductor, went down on track No. 10 and coupled to some cars standing on said track but across the entrance to tracks 6 and 7 for the purpose of moving said cars down track No. 10 and opening the way to track 7, which was also congested. In doing this work decedent Green was riding on the footboard of the tender. The train was backing; the engineer's face was towards Green and the rear of the train. He operated the train according to

signals given by hand, or by lantern at night; it was the duty of decedent Green to couple and uncouple the cars; when the cars on track No. 10 were coupled the conductor, then standing only about four or five feet from the mouth of switch No. 7, gave a hand signal to the engineer on the engine to kick the cars down track 10. By this he meant for the engineer to turn on steam and rush the engine and cars a short distance down the track so as to give the cars sufficient momentum to carry the uncoupled cars on after the engine stopped. At this time Green was on the footboard at the end of the tender and between the tender and the box car and was expected to and it was his duty to operate the lever, raise the coupling pins and thus uncouple the cars from the tender. There is evidence to the effect that the body of Green was necessarily protruded from between the cars when operating the lever which is admitted to have then been out of order. Both the tender and box car were higher than Green's head. He could not look over the tender and see the engineer to whom he was required to give signals. The engineer received and followed the instructions given by the conductor to kick the cars and it was the duty of Green on the tender to uncouple the kicked cars so that when the engine stopped the cars would continue to run down the track. In the performance of his duties the engineer put on steam and ran his engine swiftly down the track until he received a signal to cut off the steam, put on the brakes and stop his engine. It is contended that it was the duty of decedent Green to give the signal for the halting of the engine, and this appears to be correct for the reason he was in the best position to know when the cars were uncoupled and ready to be kicked. The conductor says he saw the perilous condition of Green on the car and tried to tell him, as he passed to look out for the car on track No. 7, but he says the engine was making noise and he does not know whether Green heard this warning. If he did he gave no answer or other manifestation. Nor is there any other evidence in the record tending to prove that Green knew the car was on track No. 7. At any rate the engine began to check up and the cars had separated from the tender a distance of about five or six feet, when Green's body, protruding from behind the tender either in an effort to operate the lever and uncouple the car or to signal the engineer that the uncoupling had been effected, was caught between the corner of the tender and the box car

on track No. 7 and crushed so that he immediately thereafter died.

In the court below and here the railway. company takes the position (1) that there was no negligence on its part shown by the evidence; (2) that plaintiff's right of action under the Federal employers' liability act was barred by limitations before the commencement of the action.

The first contention of the railroad is based upon the familiar exception to the general rule that a master is not required to provide a servant with a safe place to work in all cases, but the servant in some cases assumes the risks of danger incident to the employment, especially when the work to be performed by the servant is to make a place of employment then known to be out of repair and dangerous, reasonably safe for the purposes for which it is intended, and it is insisted that the switch crew including decedent Green crossed the knuckle into the classification yards for the purpose of pushing the cars down the tracks so as to make the tracks and the cars thereon reasonably safe for the passage of that and other trains. In support of this contention a great number of cases from this and other courts are cited, but it will be necessary to name only a few of those to illustrate the rule for which appellee company contends: Williamson's Admr. v. Blue Grass Fluorspar Co., 156 Ky. 226; L. H. & St. L. R. Co. v. Wright, 170 Ky. 230; Charles v. Elkhorn Min. Co., 179 Ky. 288; American Mining Co. v. Bell, 146 Ky. 68.

Appellant insists that the rule land down in the aforementioned cases has no application to the facts developed in the evidence in the case under consideration, and that seems quite true. All the cases relied upon by appellee which we have examined grew out of facts very different from those in the case with which we are dealing. In those cases the servant was sent to make safe a place known to be unsafe, or to make repairs of a dangerous place. The rule in such cases as Boyd v. Crescent Coal Co., 141 Ky. 787; L. & N. Ry. Co. v. Cooke, 150 Ky. 689; L. & N. R. R. Co. v. Boone, 138 Ky. 700; L. & H. and St. L. v. Wright, 170 Ky. 230; Wright v. Cumberland T. & T., 137 Ky. 299, is an old one which has been reiterated in case after case decided by this court. In discussing this question in Boyd v. Crescent Coal Co., 141 Ky. 787, the first case cited by appellees in their brief, the court, after setting forth the facts showing that the servant

had been employed in the mines for the purpose of propping up and making the roof safe after a partial fall, said:

"Here, then, we have a case where the party injured was the foreman whom the master had employed for the purpose of making the mine safe. It was his duty to go to the different places in the mine that were unsafe, remove the fall, and timber up so that he, his timber crew and the other men in the mine could work with safety. Appellant based his whole right to recover on the fact that the mine boss assured him that the roof was safe and that he could have removed the fall and then timbered up. As a matter of fact he was not injured in removing the fall. Nor did he rely upon the assurance of the mine foreman. He began to timber the place and was actually engaged in the work of timbering when the accident occurred. He admitted that there was danger from the roof where there had been a fall, but claimed he did not know it was as dangerous as it was."

In the case of Stratton v. Northeast Coal Company, 164 Ky. 229, in discussing the duty of the master to the servant, the court said:

"It is the duty of the master to provide the servant a reasonably safe place in which to work, but this rule does not apply where the work the servant is performing makes the place of his work dangerous."

In the case of Williams Coal Company v. Cooper, reported in 127 S. W., p. 1000, it is said:

"In mining as well as in many other occupations, there are persons whose duty it is to examine and provide for the safety of the places in which other servants are to work. There are servants who prepare the places and servants who work in these places after they have been prepared. As to the servants engaged in the work of preparation, and who are employed to make places safe for other servants the doctrine of safe place does not apply. The master should not be required to make the places safe for those he has employed to put them in safe condition."

The basis of the exception is that it would be impossible for the master to furnish the servant with a safe place to perform the duties of making safe a dangerous place. The very statement of the rule in connection with the servant's work shows the impossibility of the application in such a case.

The Colorado courts say:

"There is a wide difference between providing a safe place for the servants to work and in putting a place already found to be insecure in condition for the resumption of labor. If it happened to be true the entry (to the mine) was insufficiently timbered and insecure, according to the judgment of the jury, when the first fall occurred, and nobody had been injured, the master must undoubtedly have had the right to put the place in shape for the resumption of labor. He had the right to put an insecure place into a safe condition. Laborers who were employed to aid in this effort took upon themselves whatever of added risk might have come from the then situation of the entry. It is a most undoubted principle that where a piece of property is out of repair, the men who are employed in making it safe take upon themselves whatever of added risk comes from the existing condition of the place or the work."

Appellant earnestly and convincingly argues that this rule has no application to the facts of this case, for the reason that the switching crew, including decedent Green, were not primarily engaged in making the place safe for the passage of trains but were directly engaged in removing and distributing cars so as to make room in the classification yards for other cars on the other side of the knuckle which were yet to be brought into the classification yards, and that but for this need the switch crew would not have crawled over the knuckle, and the accident would not have happened.

It is admitted by all concerned that the car on track No. 7 was too close to the switch point to admit of reasonable clearance of cars passing on track No. 10. In other words, this car was at such a position on the track as to render it very dangerous to train operatives passing upon track No. 10. This condition was known to the foreman in charge of the switch crew at and before the time of the injury, for he had gone into the yards and was standing within from four to six feet of the car on track No. 7, having noted its position before he gave to the engineer in charge of the switch engine the signal to kick the cars down track No. 10. He admits that he knew the proximity of the car on track No. 7 to track No. 10 was dangerous but he believed that it would allow the cars then about to be kicked down track No. 10 to pass without interference, but he well knew that said car on track No. 7 was likely to strike and injure train operatives on

the side of said train or who might for any reason be projecting their bodies around the end of the engine or tender in the course of their employment. Just how thoroughly this fact was impressed upon the mind of the foreman is best shown by his evidence to the effect that he attempted to speak to decedent Green, cautioning him about the danger of the projecting car on track No. 7 immediately before Green was caught between the cars and killed. Evidently Green did not, in the noise incident to the moving train, hear the warning admonition, if it were given. Green's back was toward the car on track No. 7, and the evidence shows he probably had not seen or heard of the car on track No. 7 until he was caught and killed. He did not place it on that track nor had he been in that part of the yards since the car was placed on said track. It was early morning and he could see but dimly. He, no doubt, was engrossed in the performance of his duties, which required him to uncouple the cars from the tender and to give signals to the engineer when his duties had been performed. The engineer's face was towards Green and the protruding car on track No. 7, and he must have observed the perilous position of Greene long enough before the accident to have either stopped the engine under his control or to have given Green a danger signal. Moreover there were several ways which appellee admits were safe for the shifting of the cars without endangering the lives of its employes. If it should be conceded that decedent was guilty of contributory negligence his administrator would, notwithstanding this be entitled to recover, under the Federal employer's liability act, in the ratio of appellee company's negligence to the whole negligence causing the injury. It reasonably appears from the record as now made up that appellee company and those in charge of the operation of the switch engine and cars were guilty of negligence which in some measure, if not wholly, aided in bringing about the unfortunate death of Green, and the case should have gone to the jury under proper instructions.

(2)   Without going into the merits of appellee's second contention that the demurrer of appellant to the fourth paragraph of the answer which pleaded the statute of limitations in bar of appellant's right to maintain the action, it will be sufficient to say that there is no appeal from the order sustaining the demurrer and that question cannot be considered. The judgment appealed

from is found on pages 269, 270 and 271 of the record, and dismisses plaintiff's petition. The order sustaining the demurrer to the fourth paragraph of the answer pleading limitation is found on pages 253 and 254 of the record. No appeal was prayed from that order by appellant and no cross appeal was sought or prosecuted by the appellee. With the record in this condition we are not authorized to consider appellee's contention that appellant's cause of action, if any he had under the Federal employer's liability act, was barred by the statute of limitations before the action was commenced.

For the reasons indicated the judgment is reversed for proceedings consistent with this opinion.

Judgment reversed.